Hugh **WRIGHT** and Helen D. Wright, Plaintiffs,

v.

The **UNITED STATES** of America, Defendant.

Civ. No. 1645.

United States District Court D. Nevada.

Jan. 6, 1965.

---

W. Howard Gray and Earl M. Hill, of Gray, Horton & Hill, Reno, Nev., for plaintiffs.

John W. Bonner, U. S. Atty., for District of Nevada, Harold S. Larsen, Sp. Asst. U. S. Atty., and Gary P. Smith, U. S. Dept. of Justice (Tax Division), for defendant.

THOMPSON, District Judge.

This is an action for the refund of income taxes which were assessed against and paid by the plaintiffs for the calendar and taxable years 1957, 1958 and 1959.

This Court has jurisdiction over the parties hereto and over the subject matter under 28 U.S.C. § 1346(a) (1). The total amount at issue is Eighteen Thousand, Three Hundred Nineteen and

32/100 Dollars ($18,319.22), plus statutory interest.

### FINDINGS OF FACT

1. The plaintiffs, at all times material hereto, husband and wife, filed timely joint income tax returns for 1957, 1958 and 1959.

2. Upon audit and review of the returns, the Commissioner of Internal Revenue made several adjustments with respect to the income tax liability of plaintiffs which resulted in the making of timely assessments against plaintiffs as follows:

| Year | Tax | Interest | Total |
|------|------|---------|-------|
| 1957 | $5,483.43 | $1,539.36 | $7,018.79 |
| 1958 | 7,392.41 | 1,626.33 | 9,018.74 |
| 1959 | 1,967.06 | 314.73 | 2,281.79 |

Plaintiffs paid the amounts assessed against them on December 19, 1962.

3. Plaintiffs filed claims for refund for the years 1957, 1958 and 1959 in the respective amounts of $7,018.79, $9,018.-74 and $2,281.79 on January 4, 1963. Plaintiffs filed statutory waivers of notification and disallowance of their claims for refund on September 30, 1963.

4. Plaintiff Hugh Wright was born in 1887 and received a degree in mining engineering from the University of Texas in 1910. Mining has been his principal occupation.

5. In 1950, Hugh Wright married plaintiff Helen D. Wright, who had been widowed in 1947 and was living in a remote area of Siskiyou County, California. Her home was situated on 160.5 acres, of which all but about 8 acres was unimproved brush and cut-over timber land. Other than maintaining a couple of cows and a few chickens and raising produce for self-consumption, the land had never been farmed. After their marriage, plaintiffs made the home located on this property their principal place of residence.

6. In 1951, plaintiffs commenced a cattle breeding operation on this land The operation was terminated in 1960 when the cattle were sold and the land leased. The land was sold in 1961. A schedule reflecting the cattle purchased and sold during the period 1951 to 1960 has been received in evidence and marked plaintiffs' "Exhibit J".

7. The following schedule is a summary of income and expenses of the cattle operation from 1951 to 1960:

| Year | Gross Income | Operating Expenses | Net Gain or (Loss) Claimed |
|------|------|------|------|
| 1951 | Not available | | ($ 3,995.89) |
| 1952 | $ 3,357.05 | $ 11,336.09 | ( 7,979.04) |
| 1953 | 3,536.10 | 10,860.29 | ( 7,324.19) |
| 1954 | 3,278.45 | 13,555.41 | ( 10,276.96) |
| 1955 | 2,505.63 | 15,820.05 | ( 13,314.42) |
| 1956 | 3,269.00 | 13,147.88 | ( 9,878.88) |
| 1957 | 2,186.00 | 12,100.18 | ( 9,914.18) |
| 1958 | 3,283.00 | 11,194.26 | ( 7,911.26) |
| 1959 | 3,095.00 | 9,660.84 | ( 6,565.84) |
| 1960 | 13,350.00 | 13,273.59 | 76.41 |
| | $37,860.23 | $110,948.59 | $77,084.41 |

The annual losses for 1951–1956 were deducted as farm losses by plaintiffs, and these deductions were not questioned by the Commissioner. The claimed deductions for losses sustained in 1957–1959 were disallowed and are at issue in this litigation.

8. The following schedule reflects the gross income derived from all sources as reported on the income tax returns of plaintiffs filed for 1957–1959:

|  | 1957 | 1958 | 1959 |
|---|---|---|---|
| Dividends | $ 4,452.54 | $ 4,572.10 | $ 3,733.29 |
| Interest | 1,130.60 | 1,691.22 | 3,255.51 |
| Capital gains | 813.11 | 22,717.31 | 446.62 |
| Annuities | 5,288.40 | 5,288.40 | 5,288.40 |
| Royalties (Gross) | 59,057.93 | 57,769.62 | 15,186.18 |
| Partnership | 514.27 | 472.14 | 427.32 |
| Engineering Fees (Net) | 4,936.53 | 3,371.33 | 3,328.35 |
| Total | $76,193.38 | $95,882.12 | $31,665.76 |

9. The following schedule reflects the cost of acquisition of farm equipment and farm improvements to the property, in addition to amounts expended for the purchase of cattle from 1951–1960:

| Year | Item | Amount |
|---|---|---|
| 1952 | Bull shed and pen | $ 385.00 |
|  | Electricity installed in barn | 121.00 |
| 1953 | Cattle Oiler | 196.00 |
|  | Bean sprayer | 284.20 |
| 1954 | Pasture fence | 662.24 |
|  | Cattle chute | 336.49 |
|  | Garden tractor | 574.49 |
|  | Hay carrier in barn | 279.75 |
|  | Irrigation flumes | 548.78 |
| 1956 | Chain saw | 313.38 |
|  | Irrigation flume | 811.58 |
| 1957 | Fences | 1,044.98 |
| 1958 | GMC Pickup | 1,593.00 |
|  | Hay carrier | 230.94 |
|  | Total | $7,381.57 |

Apart from the farm expenditures, plaintiffs expended over $10,000 during 1951–1960 in improving the residential farms and dwellings on the property, including the installation and maintenance of several guest cottages and rental cabins on the premises.

10. The cattle breeding operation was commenced in 1951 with the intention in plaintiffs that it would develop into a profitable business. To accomplish such intention, it was necessary that the breeding herd be increased to approximately sixty head and that land be cleared and developed to produce hay and forage to sustain the additional livestock. The original seven to eight acres of arable land were gradually increased to

approximtely seventy-five acres by 1955, and to approximately ninety-five acres by 1959. In 1958, plaintiffs purchased thirty-five acres of adjoining land to replace production capacity lost by reason of the taking of ten to twelve acres of pasture land for a highway improvement project. Plaintiffs had planned to and did rely upon the natural increase of the original breeding herd of ten cows and one bull to produce a large enough herd to show a profit. An additional five heifers were purchased in 1953. Annual sales were made of bull calves and heifers which were unsuitable for retention as breeding stock, and of old cows and bulls culled from the breeding stock. By 1960, the breeding herd had been increased to approximately forty cows. Natural calamities, such as unanticipatable floods and an infertile bull, delayed earlier realization of a breeding herd of profitable size and additional cleared, leveled and productive land.

11. In 1951, plaintiffs were active and healthy and each of them devoted more than fifty per cent of his time and energies in working upon and developing the farm until approximately 1960 when illness caused a decision to dissolve the cattle breeding business and to lease and later sell the farm. When the enterprise was commenced in 1951, plaintiffs did not then know, nor have reasonable grounds to anticipate, that their income apart from the farm would be substantial, that is, in excess of $10,000 to $12,000 annually.

12. During the years here in question (1957–1959), plaintiffs continued the cattle breeding operation as originally planned, increased the breeding herd, increased the amount and productive capacity of the arable acreage of the farm, showed their registered cattle at purebred cattle shows and hired a foreman who was experienced in the purebred cattle business. Plaintiffs regularly kept and maintained breeding records of their livestock.

13. In 1957, plaintiff Hugh Wright, together with other persons, entered into a chromium mining transaction with one James Jansen. Mr. Jansen owned a mineral lease on certain land containing good chromium deposits, but required working capital to start mining. Wright, together with others, was to provide working capital and Jansen was to perform the services and supply approximately $25,000 worth of equipment that he owned. At the outset, plaintiffs advanced $9,000 in installments.

14. On August 26, 1957, a limited partnership agreement was entered into under the name of Big Rock Mining Company, with Jansen, as General Partner, owning fifty-three per cent. Wright was not included in this partnership. Later Jansen formed another limited partnership called Cal-Pacific Chrome Company of Oregon, of which the partners of Big Rock collectively owned a forty-nine per cent interest in proportion to their holdings in Big Rock. Jansen held the Big Rock limited partners' interests in Cal-Pacific in trust for them. Cal-Pacific proceeded to mine the property in question.

15. In the early part of 1958, Wright discovered the facts related in the preceding paragraph. He confronted Jansen and demanded the return of his $9,000. On March 2, 1958, Jansen offered to assign all of Big Rock's interest in Cal-Pacific to Wright until such time as he had fully recovered his $9,000, plus interest to that date. This proposal was accepted by Wright, and on March 8, 1958, a note was executed attesting that Jansen, individually, as a general partner of Big Rock and as trustee for the Big Rock limited partners' interests in Cal-Pacific, owed Wright $9,000. The note recited that the $9,000, plus interest, was to be paid from the first funds due from Cal-Pacific to Big Rock or any partner thereof, and was secured by an assignment from Jansen, in his various capacities, to Wright of all sums due Jansen or Big Rock from Cal-Pacific until the note was satisfied. To implement this assignment, Jansen issued an order to Cal-Pacific directing that Wright be paid all payments due Big

Rock or Jansen until $9,000, plus interest, was paid him.

16. The $9,000 note and the security therefor, identified in Paragraph 15 above, became worthless in 1958.

17. Hugh Wright was not engaged in the trade or business of loaning money. The advance of $9,000 to James Jansen represented an investment in a mining venture which, initially, was intended as the acquisition of a partnership interest. Jansen defaulted and the note for $9,000 made and delivered in 1958 was intended as acknowledgment and liquidation of Jansen's liability on account of such default.

## CONCLUSIONS OF LAW

1. The cattle breeding enterprise conducted by plaintiffs during the years 1957, 1958 and 1959 was a business operated for profit, and the ordinary and necessary expenses paid or incurred in carrying on such business should be allowed as deductions in computing plaintiffs' taxable income for such years.

2. The advances made by plaintiff Hugh Wright to James Jansen, aggregating $9,000, were not made in the course of any trade or business of the taxpayer but, on the contrary, represented a non-business bad debt or investment which, in 1958, could not be taken as an offset against or deduction from taxpayers' ordinary taxable income in the computation of plaintiffs' 1958 income tax liability.

## OPINION

### Deductibility of Farm Losses

This case involves the concept of "trade or business" under the Internal Revenue Code, and is decided by the Court on a de novo determination of the issue after consideration of the evidence presented. Although precedent is helpful for the development of guides to a proper decision, each case must be decided on its own facts. Higgins v. Commissioner, 1941, 312 U.S. 212, 217, 61 S.Ct. 475, 85 L.Ed. 783. The primary guideline which is basic in the qualification of an enterprise or activity as a trade or business is that ultimately taxpayer intends to realize a profit therefrom. The dominant hope and intent must be the realization of profit. Hirsch v. C. I. R., (9 CCA 1963), 315 F.2d 731. On the other hand; the expectation of profit need not be a reasonable expectation when viewed objectively. Hirsch v. C. I. R., supra. To state the proposition differently, each taxpayer is entitled to conceive and embark upon his own business enterprise, no matter how impractical, idiosyncratic or questionable of success it may seem to others.

The project upon which these taxpayers embarked in 1951 of developing a worthwhile farm out of some 160 acres of land, only eight of which were then in cultivation, should not be denounced by the Collector as a hobby or recreation. The production of registered breeding stock for sale is a recognized business. Taxpayers selected it as a business and diligently followed it by expenditure of personal labor and of additional capital funds for a period of nine years. They increased the arable acreage of the farm almost twelve times its initial capacity and increased their breeding herd much nearer the point where a profit might have been anticipated. More particularly, during the tax years in question (1957–1959), taxpayers continued to follow their original plan toward fruition by improving the farm, clearing additional land, increasing the breeding herd and advertising the product of their endeavors. It is not for the Collector to second-guess the taxpayer by concluding that the operating losses in earlier years dictated an abandonment of the enterprise in 1957, 1958 or 1959. Nor is it for the Collector to criticize the particulars of the management of the business by the taxpayer. Such Monday morning quarterbacking is easy, but it should be acknowledged somewhere along the line that if the success of American business should be made to depend upon the business acumen of the Collector of Internal Revenue rather than the enterprise, imagination, initiative and gambling instinct of the American businessman, little progress would be probable.

**514**

We do not doubt that the profit and loss history of the enterprise is relevant to the primary issues of motivation and intent. Relevant, too, is evidence of substantial taxable income received aside from the questioned enterprise, but this only because it offers a possible alternate motivation for continuing the effort to establish a profitable business, and, in this light, should not be accorded much weight as evidence. We see no reason in according a business characterization to the farm of a marginal, hand-to-mouth operator while reaching a contrary result merely because the taxpayer is able to afford, that is, pay from other income or from capital, the losses incurred while the farm is being developed.

We think the preponderance of the evidence plainly shows that the Wrights initiated the purebred livestock breeding business on their farm with the intent and motive of developing it into a profitable enterprise, and that their conduct demonstrates the continuation of such intention and motivation during the tax years here involved.

### BAD DEBT DEDUCTION

The $9,000 loss suffered in 1958 as a consequence of the earlier advances of money to James Jansen was a non-business bad debt which could not be deducted in full as a deduction against ordinary income. Whipple v. Commissioner, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288; 26 U.S.C. § 166.

### EFFECT OF COMMISSIONER'S DETERMINATION

In this case, the Commissioner assessed the deficiencies upon a finding by him that the livestock breeding enterprise was a hobby or recreation of the taxpayer and not a business. The Government contends that "not having overcome the presumptive correctness of the Commissioner's determination (Union Trust Co. v. Comm. of Internal Revenue, 54 F.2d 199 [C.A. 6th]), taxpayers should be denied the claimed deductions." In Conyngham v. Commissioner, July 16, 1964, 22 T.C.M., the Tax Court phrased the rule as follows: "The respondent's (Commissioner's) determination is presumptively correct and the burden of proof is upon the petitioner *to show error* in such determination." The principle has been somewhat differently expressed in other opinions.

After reviewing the authorities, the Court has concluded that the burden of proof upon plaintiffs in this case is no different than in any civil case. They must prove their case by a preponderance of the evidence. The "presumptive" or "prima facie" correctness of the Commissioner's determination serves only to place on the taxpayer the ordinary burden of proof carried by the civil litigant who asserts the affirmative of a factual issue. The Court does not sit in review of the Commissioner's determination for the purpose of finding whether there was any evidence to support it or "to show error" in the sense of demonstrating that it was arbitrary or unreasonable. Wickwine v. Reinecke, 1927, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184; United States v. Rindskopf, 1882, 105 U.S. 418, 26 L.Ed. 1131. Here we do not conclude that the Commissioner's determination was arbitrary or that he could not reasonably have inferred from the evidence that the taxpayer was not activated by a profit motive in carrying on his cattle breeding enterprise. Our conclusion is simply that the evidence produced on the trial preponderates in support of a finding that the taxpayer in good faith operated his farm with the motive and intent of ultimately establishing a profitable operation. He was, therefore, in business.

### DECISION

The plaintiffs, in cooperation with defendant, shall prepare and submit calculations of plaintiffs' tax liability for the years 1957, 1958 and 1959 in conformity with the foregoing findings, conclusions and opinion, and a form of decree, accordingly, awarding to plaintiffs the relief to which they are entitled.