**Bernard CORNFELD, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 85–1243.

United States Court of Appeals, District of Columbia Circuit.

Argued April 15, 1986.
Decided Aug. 12, 1986.

Bernard Cornfeld, pro se.  Burton W. Kanter, New York City, and Harold J. Lipsitz, were on brief, for appellant.

Richard J. Driscoll, Atty., Dept. of Justice, with whom Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup and Ann Belanger Durney, Attys., Dept. of Justice, Washington, D.C., were on brief, for appellee.

Before WALD, EDWARDS and KOZINSKI,[*] Circuit Judges.

KOZINSKI, Circuit Judge:

In this appeal from a judgment of the Tax Court we consider whether taxpayer is entitled to a business deduction attributable to ownership of a BAC 1–11 passenger jet aircraft.

## FACTS

For a number of years during the 1950's and 60's taxpayer Bernard Cornfeld was a successful entrepreneur and businessman. In 1969 he was the principal shareholder, president and chairman of the board of Investor Overseas Services, Ltd (S.A.) (IOS), a financial conglomerate that managed more than $2.5 billion in assets and employed 25,000 sales representatives in 100 countries.  As the founder of this enterprise, taxpayer acquired substantial personal wealth, enjoying a life style commensurate with his financial success.[1]

Starting in 1968 the taxpayer bought several aircraft.[2]  He also acquired a 25 percent interest in Aeroleasing, a company whose function it was to operate, maintain and charter the aircraft of its shareholders. Taxpayer paid a monthly fee to Aeroleasing to cover maintenance and operating expenses of each aircraft; Aeroleasing, in turn, hired pilots, provided advertising ser-

---

[*] The Honorable Alex Kozinski of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

1.  The Tax Court found as follows:

During the years in issue, [taxpayer] owned and lived in a villa constructed by Napoleon in the nineteenth century upon 3 acres of land on the edge of Lake Geneva, Geneva, Switzerland.  [Taxpayer] also owned a three-story house in London with a library, finished base-ment, and sauna; a castle in France where he kept 12 horses; a flat in Paris; and a second chateau in Switzerland.  He drove a Masarati and owned 2 houseboats and 3 other boats. 53 T.C.M. (P–H) ¶ 84,105, at 389 (1984).

2.  In addition to the BAC 1–11 which is the subject of this case, taxpayer's air fleet consisted of a 12–seat Falcon Jet, a 28–seat propeller-driven Convair 220, an 8–seat Jet Commander, and a Bell Jet Ranger helicopter.

vices, chartered the aircraft to the public and collected charter fees.

In September 1969, taxpayer purchased a used BAC 1–11 jet from British Aircraft Corporation. This plane was much larger than those already owned by taxpayer, seating 90 passengers. The sale was made effective September 15, 1969, when taxpayer personally took delivery.[3] At that time, and until October 31, 1969, the plane was under lease to Autair International Airways. Taxpayer promptly returned the plane to BAC for completion of the lease. BAC in turn, reduced the plane's $4.5 million purchase price by some $50,000.

Taxpayer's contract with BAC also provided for modification of the BAC 1–11. This included the addition of a fuel tank (to enable the plane to fly non-stop across the Atlantic) and the conversion of the interior to a plush 47–seat "executive" configuaration, upgrading the galley and adding a bar. This remodeling raised the cost of the plane to well over $5 million. Taxpayer paid 10 percent of the purchase price when he signed the contract and executed two notes for the balance, one covering the plane and the other spare parts.

The refurbished jet was originally scheduled for delivery in February 1970, but British Aircraft advised taxpayer that it could not complete the project until sometime in June. Before this date, in May 1970, taxpayer was removed from his position as president and chairman of the board of IOS. As a consequence, he did not complete the transaction with British Aircraft, defaulting on his installment purchase agreement. Eventually British Aircraft sold the plane to a Hong Kong corporation for about $3 million. Pursuant to the decree of a London court, taxpayer forfeited his deposit but was released from further liability on the note covering the plane.

In his 1969 and 1970 returns, taxpayer reported losses in connection with his aircraft leasing activities. The Internal Revenue Service challenged these deductions, stating as follows in its deficiency notice: "It is determined that the claimed losses from rental of airplanes for years … 1969 and 1970 were not incurred in a transaction entered into for profit…." Claims with respect to the other aircraft were settled but those pertaining to the BAC 1–11 went to trial. Before the Tax Court, the Service raised an additional contention: that the BAC 1–11, even if acquired by taxpayer for business purposes, was not placed in service by him in the tax years in issue.

The Tax Court ruled for the Commissioner on both grounds. It held that taxpayer "did not in 1969 or 1970 have an actual and honest profit objective with respect to the BAC 1–11 jet aircraft" 53 T.C.M. (P–H) at 391; and that taxpayer "did not place the aircraft in service in 1969 or 1970." *Id.* at 392.

### DISCUSSION

1. *Did the Taxpayers Have an Honest Profit Objective?*

Section 183 of the Internal Revenue Code provides that a taxpayer is entitled to business deductions only with respect to activities "engaged in for profit."[4] The test is whether the taxpayer entertained an actual and honest profit objective in pursuing the activity in question. *Dreicer v. Commissioner,* 78 T.C. 642 (1982), *aff'd mem.,* 702 F.2d 1205 (D.C.Cir.1983). While the taxpayer need not have been reasonable in expecting to make a profit, he must establish that he undertook the enterprise with the good faith objective of doing so. Treas.Reg. § 1.183–2(a); *Allen v. Commis-*

---

3. The BAC 1–11 was flown ⌐ a London airport. Taxpayer and his pilot boarded the airplane, inspected it and taxpayer signed a certificate of acceptance. Also in September, taxpayer filed an application to register the airplane in Geneva, Switzerland; on the application, taxpayer was listed as the sole owner.

4. For activities not engaged in for profit, only personal deductions such as interest and taxes, are allowable. Although section 183 applies only to tax years beginning with 1970, it comports with the law applicable to tax years prior to 1970. *See Benz v. Commissioner,* 63 T.C. 375 (1974).

*sioner,* 72 T.C. 28, 33 (1979). A review of the record persuades us that, contrary to the Tax Court's conclusion, the taxpayer here met this burden.

We start by noting that taxpayer's aircraft charter activities were not a hobby masquerading as a business. Taxpayer is not a pilot or skydiver; he does not amuse himself by collecting airplanes. This distinguishes a large class of cases where profit objective is reasonably placed in doubt because the taxpayer derives an intangible personal benefit from the purported business. *See* Treas.Reg. § 1.183–2(a); *Bessenyey v. Commissioner,* 379 F.2d 252 (2d Cir.), *cert. denied,* 389 U.S. 931, 88 S.Ct. 293, 19 L.Ed.2d 283 (1967) (raising Hungarian Half-Breds held not to be an activity for profit); *Korth v. Commissioner,* 50 T.C.M. (P–H) ¶ 81,462 (1981) (glider operated by DC–9 co-pilot held not to be for profit). Nor is this a case where the plane was purchased for taxpayer's personal use. *See, e.g., Westerman v. Commissioner,* 55 T.C. 478 (1970); *Fischer v. Commissioner,* 50 T.C. 164, 171 (1968). Nothing in the record suggests that taxpayer bought this jet as a personal plaything. Even in the luxurious 47–passenger configuration, it was obviously unsuited for use as a personal or recreational vehicle.

■ The record establishes without contradiction that taxpayer was a man of business with a knack for making money; that he acquired a small fleet of aircraft which he used in his business and also made available to the public for charter; that he hired Aeroleasing to provide the services necessary to maintain and charter the aircraft; and that the aircraft placed in service through Aeroleasing did in fact generate some charter revenues. The BAC 1–11 passenger jet fits comfortably within this pattern, raising the strong inference that taxpayer had an honest profit objective in acquiring it.

We might nevertheless defer to the Tax Court's contrary determination if the reasons it gave made sense and were supported by the record. However, we find the Tax Court's reasoning unpersuasive, leaving us with a firm conviction that it erred. *See Bessenyey,* 379 F.2d at 257 (citing *United States v. United States Gypsum,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). Thus, the Tax Court faulted taxpayer for failing to "demonstrate that he made any effort whatsoever to exploit the BAC 1–11 through leasing or charter to the general public." 53 T.C.M. (P–H) at 391. The record speaks to the contrary. Taxpayer established that all his airplanes were handled by Aeroleasing, whose business it was to provide these types of services, including advertising and outreach to the public. Taxpayer concluded a separate agreement with Aeroleasing covering the BAC 1–11, which permitted Aeroleasing to charter the plane for a fixed rate per kilometer flown. Aeroleasing was in charge of the operation and maintenance of the airplane, and Aeroleasing hired six pilots to operate the plane. British Aircraft had actually begun training these pilots on taxpayer's own BAC 1–11.

■ This evidence also undercuts the Tax Court's observation that taxpayer "failed to show that he devoted time and effort, even indirectly, to assuring the success of his charter operations or that he had personal expertise or consulted with experts in the charter industry." 53 T.C.M. (P–H) at 392. To have an honest profit objective a taxpayer need not run the business himself or have expertise in it; it suffices that he engage those who do.[5] *See* Treas.Reg. § 1.183–2(b)(3) ("[t]he fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity"). In judging whether the time the taxpayer spent on the activity is sufficient, it is important to remember that he was, at that time, running a business that controlled

---

**5.** Indeed, taxpayer's detachment from the business supports the view that he considered it a business, not a hobby.

some $2.5 billion in assets. He could hardly be expected to personally interview and hire pilots or take out newspaper ads.[6]

The Tax Court also inferred a lack of profit motive from the fact that taxpayer "abandon[ed] ... the project so soon after his ouster from IOS strongly suggest[ing] that he actually believed he would have no use for the jet if he were not associated with IOS." 53 T.C.M. (P–H) at 391. We fail to see how this establishes the absence of an honest profit objective. The taxpayer's ouster from the operation of a business that controlled billions of dollars in assets could well be expected to have an impact upon his resources and business plans. The sudden diminution of his income, coupled with the loss of a potential market for the plane,[7] would seem to provide the most plausible explanation for taxpayer's failure to complete the transaction with BAC.

Finally, the following passage from the Tax Court's opinion, further explaining why the taxpayer lacked a profit objective, gives us cause for concern:

> The remodeling of the interior of the aircraft ordered by [taxpayer] is inconsistent with a profit objective here. After being remodeled, the jet would have been able to transport only half as many passengers as before, thus making it less economical to use. In addition, [taxpayer] obligated himself to pay substantial amounts of money for modifications that delayed the availability of the jet. The modifications certainly made the aircraft more luxurious, but there is no evidence that they enhanced the prospect of profits.

53 T.C.M. (P–H) at 391–92. We cannot approve such second-guessing of business judgments by the court. The question is not whether we, or the Tax Court judge, think a particular mode of doing business is wise, but whether the taxpayer honestly believed that the method he employed would turn a profit for him. The test is the taxpayer's subjective intent, not whether a reasonable businessman would have done the same. *Allen,* 72 T.C. at 33.

Absent a finding that the business method was selected for the taxpayer's personal convenience or to promote a non-business purpose (such as recreation or a hobby), we cannot infer a lack of business objective merely because we might have done things differently. *See Wright v. United States,* 249 F.Supp. 508, 513 (D.Nev.1965) ("[i]t is not for the Collector to second-guess the taxpayer ... [n]or is it for the Collector to criticize the particulars of the management of the business"). Taxpayer's plan for operating a luxury charter jet, catering to Europe's upper crust, might or might not have worked, but he was entitled to try.[8]

In sum, the record strongly supports that taxpayer's contention that he had an honest profit objective in purchasing a BAC 1–11 aircraft. The reasons given by the Tax Court for rejecting the taxpayer's showing are unpersuasive or unsupported by the record. We therefore reverse the Tax Court's determination and hold that taxpayer did indeed have an honest profit objective.

## 2. *Was the Airplane Placed in Service?*

The Tax Court also concluded that taxpayer did not place the airplane in service in 1969 or 1970. The court did not

---

**6.** The record discloses that taxpayer took a personal interest in the refurbishing of the airplane, traveling to England with a decorator for the purpose. The Commissioner makes much of this, suggesting that taxpayer's interest in the plane's interior evidences a lack of business motivation. The Tax Court did not address this point. Our own conclusion is that taxpayer knew nothing about flying or chartering airplanes, but did know what would appeal to wealthy tourists. He therefore devoted to the business those of his talents that were relevant.

**7.** IOS, through subsidiaries, controlled a variety of business enterprises, including a vacation resort at Spain's Costa del Sol. It was apparently taxpayer's plan to use the BAC 1–11 to bring vacationers to this resort from the cold parts of Europe and North America.

**8.** We note that taxpayer's business plan appears to be no more irrational than the first class service offered by many airlines or by "luxury" air carriers.

explicate this conclusion, simply citing *Cooper v. Commissioner,* 542 F.2d 599 (2d Cir.1976). We also give the point short shrift, but reach the opposite conclusion.

The record establishes that taxpayer took delivery of the plane on September 15, 1969. The plane was then under lease to Autair, and taxpayer returned possession of the plane to British Aircraft for completion of the Autair lease. Plainly, the airplane was placed in service at that time, the service consisting of its use by Autair.[9] Taxpayer, in turn, derived an economic benefit from the deferred possession occasioned by the Autair lease.[10]

In *Cooper,* the case cited by the Tax Court, the asset was not delivered by the manufacturer to the taxpayer at all, was not under lease to anyone and was generating no economic benefit to the taxpayer. We have found no other authority supporting the Tax Court's conclusion. Indeed, under the rule apparently adopted by the Tax Court, a taxpayer purchasing any asset subject to a long term lease would be denied tax benefits until the lease expired, even though the asset generated substantial income and was acquired for a business purpose. Nothing in the Tax Code supports that result.

### CONCLUSION

We hold that the taxpayer had an honest profit objective in acquiring the BAC 1–11 aircraft and that he placed the aircraft in service on September 15, 1969, the day he took delivery and returned it to British Aircraft for completion of the Autair lease. We remand to the Tax Court for entry of judgment in accordance with this opinion.

9. Applicable Treasury Regulations provide that "[p]roperty is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function ... in the production of income." Tres.Reg. § 1.167(a)–11(e)(1)(i). This appears to describe taxpayer's situation at the time he returned the plane to BAC for completion of the Autair lease. The plane was thereafter not retired from service at least until taxpayer refused delivery in August 1970. Treas.Reg. §§ 1.167(a)–8, 1.167(a)–10(b).

10. Here the contract between taxpayer and BAC explicitly reflected an economic benefit to the taxpayer from deferring possession of the airplane, namely the $50,000 discount he received on account of the Autair lease. The benefit need not be broken out in this fashion. When an asset is acquired subject to deferred possession, the purchase price will normally reflect a discount from the price the purchaser would have paid to obtain immediate control.