934 F.2d 319
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Vernon E. MARTENS, Lucille E. Martens, Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 90-3104.
 United States Court of Appeals, Fourth Circuit.
 Submitted Feb. 8, 1991.
Decided May 28, 1991.
As Amended July 11, 1991.
 
 Appeal from the United States Tax Court. B. John Williams, Tax Court Judge. (Tax Ct. No. 39439-87)
 William Jordan Temple, Alexandria, Va., for appellants.
 Shirley D. Peterson, Assistant Attorney General, Gary R. Allen, Ann B. Durney, David A. Hubbert, Tax Division, United States Department of Justice, Washington, D.C., for appellee.
 U.S.T.C.
 AFFIRMED.
 Before ERVIN, Chief Judge, WILKINSON, Circuit Judge, and REBECCA BEACH SMITH, United States District Judge for the Eastern District of Virginia, Sitting by Designation.
 PER CURIAM:
 
 
 1
 Vernon Martens and Lucille Martens filed a petition in the United States Tax Court contesting deficiencies in their income tax liability for 1982 and 1983 which the Commissioner of Internal Revenue proposed to assess against them. The Tax Court entered a decision in favor of the Commissioner on April 10, 1990. The taxpayers timely appealed from the Tax Court's decision to this court. We affirm.
 
 
 2
 * Vernon Martens is a pathologist who owned three medical laboratories in the Washington, D.C., metropolitan area.[1] Martens reported net profits from the laboratories of $548,739.76 for 1982 and $340,953.89 for 1983. Martens used the cash basis of accounting.
 
 
 3
 Martens operated several farms and resided on one farm in Haywood, Virginia. Martens reported net losses from his farming operations in the amount of $213,936 in 1982 and $191,241.77 in 1983. The IRS allowed these losses.
 
 
 4
 Martens began purchasing construction equipment in the early to mid 1970's, intending to lease the equipment. Prior to purchasing the equipment, Martens discussed construction equipment with a friend who was a farmer and a farm equipment distributor. He also talked about equipment leasing with another acquaintance.
 
 
 5
 Martens purchased equipment at various times from 1973 to 1982. He leased the equipment to R.J. Martens Contracting Co., Inc. (Contracting). Contracting was wholly owned by Martens' son, Robert J. Martens, who had been a construction supervisor prior to forming Contracting in 1973. Contracting was the only customer to whom Martens leased his equipment. Martens did not attempt to lease his equipment to any other person or entity other than Contracting.
 
 
 6
 At the beginning of the relationship between Martens and Contracting, the parties operated under an oral agreement. Under that agreement, Contracting was to pay 30% of its monthly net proceeds to Martens as rent for the equipment. Sometime prior to 1978, the parties entered into a written contract whereby Contracting would pay 50% of its monthly net income to Martens as rent for the equipment. This written agreement had no starting date, but by its terms, the agreement ended on January 1, 1978. This agreement was entitled "Machinery and Equipment Lease Agreement." In addition to setting out the amount of rent to be paid for the equipment, the agreement provided that Contracting would maintain the equipment and bear the expense of any repairs, while Martens would procure insurance against loss or damage due to fire, explosion, or other casualties. This agreement was the only written agreement entered into between Contracting and Martens.
 
 
 7
 Around 1981, Contracting began to experience financial difficulties, eventually ceasing operations in 1982. In 1982, equipment that Contracting owned was auctioned for the benefit of creditors of Contracting. At the auction, Martens purchased some of this equipment. Martens also assumed the notes secured by other equipment, thereby purchasing more of Contracting's equipment. Martens did not admit liability for any of the debts of Contracting, nor was any of Martens' property subject to the claims of Contracting's creditors.
 
 
 8
 In 1982, Martens started his own construction company, called Vemart Contracting, Inc. (Vemart). Vemart was wholly owned by Martens and engaged in the same construction activities as had Contracting. Martens hired his son, Robert Martens, as general manager and put him in charge of the day-to-day operations. In 1983, Martens leased some equipment to Vemart, while simply transferring other equipment directly to Vemart. Martens did not attempt to lease his equipment to any other person or entity other than Vemart.
 
 
 9
 Martens never maintained books or records for his leasing activities, and he did not prepare any business plans before entering into the leasing business. Martens did not maintain an office for the leasing activities, nor did he hire any employees other than Robert. Martens did not maintain a separate bank account for his leasing activities either.
 
 
 10
 In the years 1977 through 1982, Martens reported net losses from his construction leasing activities. The losses were as follows: $25,995.14 in 1977; $16,438.98 in 1978; $30,984.92 in 1979; $33,868.60 in 1980; $110,516 in 1981; $168,302 in 1982; and $80,490 in 1983.[2] Martens has never reported a profit from the equipment leasing activities. The equipment was not expected to appreciate, and Martens never sold any equipment at a gain. Martens reported $20,920 of income in 1982 and $44,260 in income in 1983 from these activities, although he has never received these amounts.
 
 
 11
 During 1982 and 1983, Martens claimed deductions for salaries paid to several of his relatives. They included his sons, Gary Martens and Vernon Martens, Jr., his daughters Carolyn Zugata and Elita Martens, and his son-in-law, James Tapocik. The Commissioner disallowed portions of the amounts claimed as follows:
 
 
 12
 AMOUNT CLAIMED AMOUNT ALLOWED
 1982 1983 1982 1983
Vernon Martens, Jr. $20,090 $18,650 $5,000 $5,000
Gary Martens 13,000 25,200 2,500 600
Carolyn Zugata 4,000 2,000
Elita Martens 2,000 500
James Tapocik 11,053 1,000 6,527 500
 
 
 13
 Martens issued a Form 1099 to Vernon, Jr., Gary, Carolyn, and James for each of the years when he claimed a deduction. The amounts paid to Vernon, Jr., Gary, and Elita, and the $1,000 to James in 1983 were substantiated. Vernon, Jr., was a tax attorney; he allegedly performed services for Martens including preparing tax returns, negotiating contracts, advising on investments, and giving legal advice to Martens. Neither Martens nor Vernon, Jr., kept records of the hours worked and amount paid for the legal services. Further, Martens kept no books or records pertaining to the employment of the other family members.
 
 
 14
 During 1982 and 1983, Martens rented an apartment in Washington, D.C. Martens stayed at the apartment during the week to be closer to his laboratories rather than returning all the way to Haywood, Virginia. Martens claimed deductions for apartment rental in the amounts of $4,800 in 1982 and $6,000 in 1983. It was established that these amounts were actually paid. The apartment did not have a separate business telephone. No customers, patients, or clients of the medical laboratories were received there.
 
 
 15
 The IRS reviewed Martens' tax returns for 1982 and 1983, disallowing some of the claimed deductions. The IRS disallowed expenses relating to the equipment leasing activities because they did not occur during an activity engaged in for profit under Section 183 of the Internal Revenue Code. The IRS disallowed some of the payments to Martens' children because they constituted unreasonable compensation for services actually rendered under Section 162 of the Internal Revenue Code. Finally, the IRS disallowed the deduction for the Washington apartment under Section 280A of the Internal Revenue Code. The IRS mailed a notice of deficiency to Martens on September 30, 1987.
 
 
 16
 Martens filed a petition with the United States Tax Court on December 23, 1987. In the petition, Martens contested the deficiency determinations. A trial was held on December 15, 1988 in the Tax Court with Judge Williams presiding. The Tax Court entered a decision in favor of the Commissioner.
 
 
 17
 The court first held that the leasing activities of Martens were not an activity engaged in for profit. The court gave greater weight to objective factors than to Martens' statement of his intent. After discussing the factors set out in Treasury Regulation Sec. 1.183-2(b), the court determined that Martens had not engaged in the leasing activities for profit.
 
 
 18
 Next, the court determined that the Commissioner correctly disallowed some of the compensation paid to the Martens children because the amounts constituted unreasonable compensation. Finally, the court held that the deductions for the Washington apartment were properly disallowed.
 
 II
 
 19
 At the outset, we note that findings of fact by the Tax Court are not to be set aside unless they are clearly erroneous. I.R.C. Sec. 7482(a), 26 U.S.C. Sec. 7482(a); Fed.R.Civ.P. 52(a); Friedman v. Comm'r, 869 F.2d 785, 791 (4th Cir.1989); Rutter v. Comm'r, 853 F.2d 1267, 1272 (5th Cir.1988); Charles Schneider & Co. v. Comm'r, 500 F.2d 148, 150 (8th Cir.1974), cert. denied, 420 U.S. 908 (1975). Martens raises three issues on appeal. Each involves findings of fact; therefore, we review each under the clearly erroneous standard.
 
 
 20
 * The first issue presented is whether the Tax Court erred in determining that Martens did not engage in the equipment leasing activities for profit. The general rule is that an assessment of the Commissioner is presumptively correct; the taxpayer has the burden of proving it wrong. Faulconer v. Comm'r, 748 F.2d 890, 893 (4th Cir.1984); Liddy v. Comm'r, 808 F.2d 312, 314 (4th Cir.1986); Baxter v. Comm'r, 816 F.2d 493, 495 (9th Cir.1987). Thus, for Martens to have prevailed in the Tax Court, he had to carry his burden of proving that the Commissioner's determination of deficiency was wrong. The Tax Court found that Martens did not carry his burden. Section 183 of the Internal Revenue Code provides that a taxpayer may take a business deduction only with respect to activities "engaged in for profit." I.R.C. Sec. 183. See Cornfeld v. Comm'r, 797 F.2d 1049, 1051 (D.C.Cir.1986). Under Sec. 183, a taxpayer has the burden of persuasion to show that he is engaged in an activity for profit. Rule 142(a), Tax Court Rules of Practice and Procedure; Faulconer, 748 F.2d at 893; Hayden v. Comm'r, 889 F.2d 1548, 1552 (6th Cir.1989).
 
 
 21
 Whether a particular activity is engaged in for profit is determined by reference to objective standards and an examination of all the facts and circumstances. Polakof v. Comm'r, 820 F.2d 321, 324 (9th Cir.1987), cert. denied, 484 U.S. 1025 (1988). In Faulconer, this court discussed the proper analysis for determining whether an activity was engaged in for profit. We stated:
 
 
 22
 The ultimate determination of whether an activity is engaged in for profit is to be made, according to the legislative history and the regulations, by reference to objective standards, taking into account all of the facts and circumstances of each case. A taxpayer's mere statement of intent is given less weight than objective facts. A reasonable expectation of profit is not required but the facts and circumstances must indicate that the taxpayer entered into or continued the activity with the objective of making a profit.
 
 
 23
 748 F.2d at 894.
 
 
 24
 The IRS has promulgated regulations which set out factors to be considered in determining whether an activity is engaged in for profit. See 26 C.F.R. Sec. 1.183. The regulations provide that "[i]n determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent." 26 C.F.R. Sec. 1.183-2; Faulconer, 748 F.2d at 894. The regulations also set out a nonexclusive list of nine factors to be considered:
 
 
 25
 (1) the manner in which the taxpayer carries on the activity;
 
 
 26
 (2) the expertise of the taxpayer or his advisors;
 
 
 27
 (3) the time and effort expended by the taxpayer in carrying on the activity;
 
 
 28
 (4) the expectation that assets used in the activity may appreciate in value;
 
 
 29
 (5) the success of the taxpayer in carrying on other similar or dissimilar activities;
 
 
 30
 (6) the taxpayer's history of income or losses with respect to the activity;
 
 
 31
 (7) the amount of occasional profits, if any, which are earned;(8) the financial status of the taxpayer; and
 
 
 32
 (9) elements of personal pleasure or recreation.
 
 
 33
 26 C.F.R. Sec. 1.183-2(b). In Faulconer, this court used an analysis of these factors, and we noted that "[t]hese factors are not exclusive, and no one factor or mathematical preponderance of factors is determinative." Faulconer, 748 F.2d at 894.
 
 
 34
 The Tax Court analyzed Martens' leasing activities by applying the above nine factors. First, the court determined that Martens did not operate the leasing activities in a businesslike manner. Stated reasons for this finding were that Marten leased his equipment only to his son's company and then his own company, never making a profit. The court found it important that Martens never leased the equipment to any corporation that was not managed by his son Robert. The court concluded that Marten did not lease the equipment to others because his objective was to provide for his son's business. The court also found it important that Martens kept no records or books relating to his leasing activities.
 
 
 35
 This finding under the first factor was a finding of fact that was not clearly erroneous. The regulations set out that maintaining complete and accurate books and records may indicate that an activity is engaged in for profit. 26 C.F.R. Sec. 1.1832(b)(1). Further, they provide that changing operating methods or abandoning unprofitable methods in the face of losses may indicate a profit motive. Here, Martens did neither. He kept no records at all. In addition, he continued to lease his equipment to his son's company and then his own company in the face of continued losses year after year. The facts easily support a finding that the leasing activity was not conducted in a businesslike manner.
 
 
 36
 Next, the Tax Court examined the expertise of Martens and his advisors in the leasing activities under the second factor. Under this factor, the regulations provide that preparation for an activity by study of the business and economic practices or consultation with experts in the field might indicate a profit motive. 26 C.F.R. Sec. 1.183-2(b)92). Here, Martens had no prior experience in leasing equipment before he undertook this activity. He only discussed the activity with two persons: a friend who sold farm machinery and an acquaintance who was in construction "in a small way." He relied on his son's advice; however, his son had only worked as a construction laborer and supervisor and had no experience in equipment leasing. Thus, Martens did not have any expertise in equipment leasing activities, and the Tax Court found that there was no evidence that either of the persons consulted by Martens had any expertise in the field of leasing activities. Under this second factor, the evidence does not indicate that Martens had a profit motive.
 
 
 37
 The third factor to be considered under the regulations is the time and effort expended by the taxpayer in carrying on the activity. 26 C.F.R. Sec. 1.183-2(b)(3). Martens testified that he spent approximately 8-10 hours a week on the leasing activities. Martens did not offer any documentary evidence to support this assertion. He kept no records or books for his leasing business that might have substantiated his claim. The Tax Court found that "evidence does not support a finding that [Martens] spent more than an insubstantial amount of time in the equipment leasing activity." The court found this despite Martens' testimony. Martens asserts that this finding was error. However, the court was free to disregard the testimony of Martens if it found that he was not credible. Bose Corp. v. Consumers Union of United States, 466 U.S. 485, 512 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it."). Further, the court as trier of fact was not required to accept Martens' testimony, even though it was not contradicted. Murphy v. City of Flagler Beach, 846 F.2d 1306, 1310 (11th Cir.1988) ("[T]he jury was not bound to accept the plaintiff's evidence concerning his damages, even if it was not controverted.") Here, the court determined as a matter of fact that Martens spent an insubstantial amount of time on the leasing activity. Under the clearly erroneous standard of review, there is enough evidence to support this finding. Were we the trier of fact, we might have believed Martens' time and effort spent to have been substantial; however, we are not entitled to reverse the Tax Court's finding simply because we are "convinced that [we] would have decided the case differently." Anderson v. Bessemer City, 470 U.S. 564, 573 (1985). We find that the court's determination was not clearly erroneous.
 
 
 38
 The fourth factor to be considered is whether there was an expectation that the assets used in the activity would appreciate in value. 26 C.F.R. Sec. 1.183-2(b)(4). Evidence showed that Martens did not expect the used equipment that he purchased to appreciate in value. In fact, he never sold any of his equipment at a profit. The Tax Court correctly found that there was no expectation that the assets would appreciate.
 
 
 39
 The fifth factor is the success of the taxpayer in similar and dissimilar activities. 26 C.F.R. Sec. 1.183-2(b)(5). The regulations set out that if a taxpayer has engaged in similar activities and converted them from unprofitable to profitable enterprises, then that might indicate a profit motive in the current unprofitable activity. Id. Here, Martens was a successful pathologist and successfully operated several laboratories in the Washington metropolitan area. However, he had no history of taking unprofitable activities and turning them into profitable ones. The court, in addressing this factor, merely focused on the large losses which occurred throughout the history of the equipment leasing activity. It seems clear that this factor does not indicate that Martens had a profit motive.
 
 
 40
 The sixth factor considers the history of the taxpayer's success in the particular activity, specifically his income or losses. 26 C.F.R. Sec. 1.183-2(b)(6). As the Tax Court noted, Martens continued to operate his leasing business in the face of significant losses year after year without making any changes in his operating plans. He continued to only lease to his son's company, not seeking other, possibly more profitable customers. When his son's company failed, Martens started his own company, leasing his equipment only to that company. Despite the fact that his son's company had failed, Martens hired his son to manage his newly created company. The regulations provide that
 
 
 41
 [w]here losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit.
 
 
 42
 26 C.F.R. Sec. 1.183-2(b)(6). The regulations also point out that unexpected events such as market depression might explain some of the losses. Id. Here, Martens might be able to assert that the market depression was responsible for his losses in the year 1982. However, in the face of years of continued losses, this one year of arguably explainable losses does not change the overall picture of continued losses indicating lack of profit motive.
 
 
 43
 The seventh factor looks at the amount of occasional profits, if any, which are earned. 26 C.F.R. Sec. 1.183-2(b)(7). The regulations provide that "[a]n occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit." Id. In this case, there was never even an occasional small profit; there was never any profit at all. In the face of large losses and large investments, no profits were ever shown. Under this factor, it appears that Martens did not have a profit motive.
 
 
 44
 The eighth factor considers the financial status of the taxpayer. 26 C.F.R. Sec. 1.183-2(b)(8). The regulations note that "[s]ubstantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit...." 26 C.F.R. Sec. 1.183-2(b)(8). In 1982, Martens had an income of $548,739.76; in 1983, his income was $340,953.89. Martens deducted $168,302 in 1982 for his loss from leasing and $80,490 in 1983. Thus, Martens had a substantial income from a source other than his leasing activities, specifically from his pathology practice. In addition, he derived a substantial tax benefit from the leasing losses because he could offset a large amount of his income, thereby lowering his final tax bill. These facts indicate that Martens did not have a profit motive under the eighth factor.
 
 
 45
 The final factor considers whether the taxpayer derives some personal pleasure or recreation from the activity. 26 C.F.R. Sec. 1.183-2(b)(9). Here, the evidence showed that Martens wanted to help his son in business. That was clearly one of his motivations which gave him personal pleasure. We note that the regulations do not require that profit be the only motive. "An activity will not be treated as not engaged in for profit merely because the taxpayer has purposes or motivations other than solely to make a profit." 26 C.F.R. Sec. 1.183-2(b)(9). In this case, Martens was motivated in part by his desire to help his son. However, that fact alone does not mean that he did not have a profit motive.
 
 
 46
 After considering the above factors, the Tax Court concluded that Martens did not have a profit motive in engaging in the leasing activities. As shown by the above analysis, the court made a correct determination. This court has said that "no one factor or mathematical preponderance of factors is determinative." Faulconer, 748 F.2d at 890. Under the above factors, eight if not all nine indicate lack of profit motive. This is not a situation where only one factor indicates lack of profit motive, or where several factors indicate lack of profit motive. Rather, each factor indicates lack of profit motive.
 
 
 47
 Martens asserts that the court's "metronomic application of the factors" in this case did not properly take into account the circumstances. Martens asserts that the court should have focused on the entire economic picture because he was engaged in a joint venture with his son, and the court should have looked at the profit motive of the joint venture rather than the motive of the leasing activities. See Campbell v. Comm'r, 868 F.2d 833, 836 (6th Cir.1989).
 
 
 48
 Martens points to Campbell v. Commissioner for support for this proposition. Id. In that case, a professional corporation of doctors formed a partnership to buy an airplane. Because of airline de-regulation, plane service to their city had been curtailed. The partnership purchased the plane to facilitate travel in the face of this curtailed service. The Tax Court found lack of profit motive, focusing on the close relationship between the corporation and the partnership. The Sixth Circuit reversed, stating that "[t]he profit motive in these cases need not be isolated or attributed to just the individual or to just the corporation. The entire economic relationship and its consequences are what determine profit motive." Id. at 836-37.
 
 
 49
 Campbell is factually distinguishable from the case at bar. In that case, there was no question that a partnership existed. The Tax Court just focused too narrowly on the partnership. The Sixth Circuit held that the court should have considered that the partnership's benefit was closely related to the success of the corporation, and that the partners benefitted when the corporation's overall profits increased as a result of the leasing activities. Here, there was no joint venture. The only written agreement between the parties expressly stated that it was a lease agreement. There is no evidence that the relationship between the parties was a joint venture. Martens asks us to interpret the evidence before us in an strained way which would be most favorable to him, without proffering any proof that there was a joint venture. In fact, all the evidence before us points to the fact that this was a leasing arrangement. Martens had the burden of proving the existence of a joint venture, and he failed to carry that burden. Martens cites to Drobny v. Commissioner, 86 T.C. 1326 (1986), for further support in his joint venture argument. There, the court stated that "the existence of a profit objective of a joint venture is generally determined at the joint venture level." Id. at 1342. Again, the case is factually different from the case at bar. There, a joint venture was actually formed. There was no question as to the existence of the joint venture. Here, Martens merely asserts that the relationship was a joint venture, but does not offer any proof supporting that assertion.
 
 
 50
 As the regulations and the cases state, when making the determination about the existence of a profit motive, more weight should be given to the objective facts than to the taxpayer's statements of intent after the fact. 26 C.F.R. Sec. 1.183-2; Faulconer, 748 F.2d at 894. Here, the only evidence in support of a finding that Martens had a profit motive is Martens' own testimony. The objective facts point to the contrary conclusion. Further, a finding regarding a taxpayer's motivation is one of fact, and thus cannot be reversed unless clearly erroneous. Hayden v. Comm'r, 889 F.2d 1548, 1552 (6th Cir.1989). The Tax Court found that Martens did not engage in the leasing activities with a motive for profit. We hold that this finding was not clearly erroneous.
 
 B
 
 51
 The second issue before us is whether the Tax Court erred in affirming the disallowances of some of the salaries paid by Martens to his children because some of the salaries were unreasonable. Section 162 of the Internal Revenue Code allows for the deduction of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including ... a reasonable allowance for salaries or other compensation for personal services actually rendered." 26 U.S.C. Sec. 162(a)(1). In order for the compensation to be deductible, it must be: reasonable in amount; for services actually rendered; and paid or incurred. 26 C.F.R. Sec. 1.162-7(a). The reasonableness of compensation is a question of fact. Rutter v. Comm'r, 853 F.2d 1267, 1271 (5th Cir.1988); Charles Schneider & Co. v. Comm'r, 500 F.2d 148, 151 (8th Cir.1974). The court should look at all the facts and circumstances in the case in deciding whether the compensation was reasonable. Charles Schneider, 500 F.2d at 151; Owensby & Kritikos, Inc. v. Comm'r, 819 F.2d 1315, 1323 (5th Cir.1987). The burden of proving that the compensation was reasonable is on the taxpayer, Eller v. Comm'r, 77 T.C. 934, 962 (1981), and the Tax Court's determination should not be reversed unless clearly erroneous. Owensby & Kritikos, 819 F.2d at 1323; Charles Schneider, 500 F.2d at 150.
 
 
 52
 The fact that payments are made to the taxpayer's children does not preclude their deductibility. Eller, 77 T.C. at 962. In addition, no single factor is determinative; rather, the court should consider the totality of the facts and circumstances. Owensby & Kritikos, 819 F.2d at 1323.
 
 
 53
 The Tax Court found that Martens did not prove "that amounts greater than those allowed by [the Commissioner] were deductible compensation paid to the children." The court noted that Martens did not keep any records or books reflecting hours worked, jobs performed, or compensation paid. The court also noted that, with the exception of Vernon, Jr., the only evidence of the compensation paid to the children, was the "uncorroborated testimony" of Martens. The Tax Court pointed out that there were inconsistencies between Martens' tax statements and his testimony at trial.
 
 
 54
 Martens had the burden of proving that the compensation he paid to his children was reasonable. The Tax Court held that Martens did not meet his burden. We cannot reverse that ruling unless it was clearly erroneous. After reviewing the testimony of Martens at trial, we conclude that the court's findings were not. While Martens is a sympathetic man, he kept no records of what work his children did for him, and he testified only in vague terms as to what they did. He offered no documentary evidence to support the claimed deductions for compensation. As we noted previously, the Tax Court was free to disregard any testimony which it found to be not credible. See Bose Corp., 466 U.S. at 512. Martens simply failed to carry his burden. Therefore, we cannot say that the Tax Court clearly erred when there is no solid evidence supporting that conclusion.
 
 C
 
 55
 The final issue on appeal is whether the Tax Court erred in determining that the deduction claimed by Martens for his Washington apartment was not allowed under 26 U.S.C. Sec. 280A. Section 280A(a) sets out the general rule that no deduction is allowed for the use of a dwelling which is used by the taxpayer as a residence. Section 280A(c) sets out exceptions to the general rule where deductions are allowed. Section 280A provides:
 
 
 56
 (1) Certain business use.--Subsection (a) shall not apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis--
 
 
 57
 (A) as the taxpayer's principal place of business,
 
 
 58
 (B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or
 
 
 59
 (C) in the case of a separate structure which is not attached to the dwelling unit, in connection with the taxpayer's trade or business....
 
 
 60
 26 U.S.C. Sec. 280A(c). Section 280A imposes a heavy burden on taxpayers to prove that their home office expenses are deductible. Meiers v. Comm'r, 782 F.2d 75, 77 (7th Cir.1986).
 
 
 61
 The Tax Court found that Martens had not established that he used a portion of the apartment "exclusively" and on a "regular basis." The court found that Martens testified only vaguely that he stored records from the hospitals and construction business there. Martens also testified that he spent some nights there during the week to keep from having to travel all the way back to the farm in Virginia. The court found that the general testimony did not meet Martens' burden of proving exclusive use. Again, the court was free to disregard any testimony found not to be credible. See Bose Corp., 466 U.S. at 512.
 
 
 62
 The Tax Court also found that Martens did not prove that he fit within any of the exceptions under Sec. 280A. Specifically, the court found that he did not prove that the apartment was his principal place of business or that he met clients, patients, or customers there. Martens offered no evidence that the apartment was his principal place of business. In fact, he offered little evidence that he did any business there, except for storing files. In addition, the evidence showed that Martens did not meet clients, customers, or patients there.
 
 
 63
 In sum, the Tax Court found that Martens did not meet his burden of proving that the apartment expenses were deductible under Sec. 280A. Given the lack of evidence offered by Martens, this finding was not clearly erroneous.
 
 III
 
 64
 To summarize, the Tax Court made three rulings which were challenged on appeal. The court ruled: (1) that Martens did not engage in his leasing activity for profit; (2) that some of the salaries paid to his children were unreasonable; and (3) that the Washington apartment could not be deducted as a business expense. We find that none of these factual findings was clearly erroneous. Therefore, we affirm the decision of the Tax Court.
 
 
 65
 AFFIRMED.
 
 
 
 [1]
 Lucille Martens is a party to this action solely because she filed a joint return with Vernon Martens during the years at issue. We will refer to Vernon Martens as Martens for simplicity and discuss the filings and issues only with respect to him and not his wife
 
 
 [2]
 The years at issue in this case are 1982 and 1983