MARIO G. De MENDOZA, III, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
De Mendoza v. Commissioner
Docket No. 11182-92
United States Tax Court
T.C. Memo 1994-314; 1994 Tax Ct. Memo LEXIS 317; 68 T.C.M. (CCH) 42; July 7, 1994, Filed *317 Decision will be entered under Rule 155. For petitioner: Richard Paladino and Robert O. Rogers. For respondent: William B. McCarthy and John T. Lortie. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the years 1986, 1987, and 1988, in the following amounts: Year
Deficiency
1986
$ 156,316.50
1987
102,963.55
1988
42,145.12
The issue for decision is whether petitioner operated his polo activity with a profit objective. Petitioner contends that in deciding this issue, we should treat legal fees he received from clients he met through polo activities (polo clients) as polo-related income. We hold that petitioner's legal fees from his clients are not polo-related income, and that he did not operate his polo activity with a profit objective. Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioner
Petitioner resided in Palm Beach, Florida, when he filed the petition. Petitioner *318 was born and raised in Cuba. He immigrated to the United States in 1961. He attended the University of Miami and received an accounting degree from Kent State University. He later worked in the tax department of the accounting firm of Deloitte, Haskins & Sells in Philadelphia, Pennsylvania. In 1972, petitioner graduated from Dickinson School of Law. He began practicing law in Florida in 1972. Petitioner currently practices law as a real estate attorney in Palm Beach County, Florida, in the partnership of Mendoza, Callas & Schilling. Petitioner has always enjoyed polo. His family owned ranches in Cuba, and he has maintained and ridden horses since his early childhood. Petitioner attended polo matches when he was a child and in the United States while he attended college and law school. He attended polo matches in Florida during the late 1970s and the early 1980s. 2. Alamendares Farm Corp.
Petitioner incorporated Alamendares Farm Corp. (AFC), a subchapter S corporation, on March 9, 1982, to buy and sell polo horses. Petitioner is the sole shareholder of AFC. Before he began to operate his polo activity through AFC, petitioner did not make a written budget, forecast *319 of profitability, or break-even analysis. AFC used both purchased and leased property for its polo operations. AFC owned about 10 acres of land during the years in issue. By the time of trial, AFC had bought 30 acres of land for $ 557,500. The property included a barn, a bunkhouse where the horse grooms lived, and a built-in stone barbecue installed in 1985 at a cost of $ 3,653. Petitioner has never lived or slept at the farm. The board of directors of AFC held regular meetings. AFC maintained separate bank accounts, books, and records. A certified public accountant prepared AFC's books, annual financial statements, and corporate income tax returns. AFC kept separate files for each horse which contained information about the horse's teeth, shoes, vaccinations, and wormings. In addition to its polo activities, AFC invested in real estate partnerships. The gains and losses from those activities were segregated on AFC's financial statements and tax returns. 3. The Polo Activity
Petitioner bought horses and formed a polo team in 1982 and has maintained a team since then. A polo team has four players. Each player plays six periods called "chukkers". Each chukker *320 lasts 7-1/2 minutes. Generally, each player needs six horses per game. It costs about $ 60,000 to buy five or six polo horses and the required tack (i.e., saddles and bridles). It costs $ 15,000 to $ 25,000 per year to maintain and care for the horses. Polo players are ranked on a scale of -2 to 10 goals. There are about 10 to 15 10-goal players in the world. Petitioner is a two-goal player. Petitioner ranks in about the top one-fourth or one-third of U.S. polo players. Untrained polo horses are called "green". Trained polo horses are called "made". It takes 1 to 2 years to train a green horse so that it can be used to play polo. When petitioner began the polo activity, he bought made horses for resale. He later started buying green horses. He was buying semi-made horses at the time of trial because inexpensive semi-made horses were available from failed polo farms. Petitioner had not managed a horse farm before forming AFC. Petitioner has subscribed to various equine and polo magazines since 1982, and he is a member of the U.S. Polo Association. He hired people to teach him to play polo and to help him buy and train horses, and he hired players for AFC's polo team. *321 AFC did not advertise its polo horses, but sold them through personal contacts. Negotiations to buy a polo horse often occur at a polo practice or match. Interested buyers often go to polo matches to see the quality of the horses. The horses perform in polo matches in order that their skills are displayed to potential buyers. AFC showed its horses to potential buyers at polo matches in which its team played. AFC also organized small games and invited prospective buyers to try the horses. High-goal polo players did not buy horses from AFC in its early years because AFC had not yet established a meaningful reputation. From 1983 to 1991, petitioner employed Peter Rizzo (Rizzo) to assist him with the polo activity. Rizzo is a six-goal polo player who has made a living through polo. Rizzo has been a professional polo player since 1967. Rizzo bought and sold about 300 horses before working for AFC, most of which were polo horses. When Rizzo began working for AFC in 1983 there were two or three other employees who managed the farm and trained the horses. In 1984, Rizzo became the general manager of the farm and the polo team. Petitioner terminated Rizzo's employment in 1991. *322 At the time of trial, Rizzo was the manager of Royal Palm Polo Sports Club, one of the largest polo clubs in the world. 4. Petitioner's Involvement in AFC
Petitioner went to the farm to work and play polo. During the years in issue, petitioner spent about 30 hours per week at the farm during the summer. During the rest of the year, he usually went to the farm on Saturdays and Sundays, and left the office two to three times per week to attend tournaments. Petitioner helped train many of AFC's horses and sometimes negotiated the sale of the horses. Petitioner played for AFC's team and other teams in polo tournaments. At the farm petitioner performed such tasks as cleaning stalls, mowing grass, painting fences, and sodding fields. Petitioner spoke by telephone with farm employees while he was at his law firm and did some recordkeeping there. Petitioner prepared a work list each weekend when he visited the farm if he was not going to be at the farm during the next week. The list included work to be done and the training schedule for each horse. 5. Income and Expenses From Polo Activities
AFC had gross receipts from its polo operations for each year from 1982 *323 to 1992. AFC received income from horse sales, tournament earnings, promotions, commissions, consulting, and instructing fees. Following are AFC's gross receipts and losses from 1982 to 1992 and the depreciation reported each year: Year
Gross Receipts
Profit/(Loss)
Depreciation
1982
$   3,393
($   176,085)
$  27,824
1983
49,976
(335,661)
44,997
1984
125,475
(224,160)
38,748
1985
94,139
(208,203)
30,035
1986
17,365
(230,967)
42,684
1987
28,389
(259,121)
38,839
1988
140,200
(150,179)
37,491
1989
52,792
(335,591)
44,202
1990
129,800
(193,392)
39,448
1991
94,959
(137,881)
33,832
1992
120,408
(114,350)
29,349
Total
856,896
(2,365,590)
407,449
6. AFC's Horses
A polo horse can become worthless quickly because of injuries or illness. It may be necessary to "put down" (i.e., "kill") a sick or injured horse from a business standpoint. More of AFC's horses have been killed than sold. Petitioner told buyers of two horses AFC sold in 1991 that he wanted to sell to generate cash to bolster his position in this case. AFC sold a horse named Nevada for $ 25,000 in 1992. Nevada was unsuitable for polo and was sold as a jumper horse. *324 AFC sold a horse named Mambe for $ 45,000 in April 1992. Mambe had a natural suitability for polo. Petitioner displayed Mambe by riding him in polo matches. Mambe was sold to Kerry Packer (Packer), who buys the best polo horses that he can to play in tournaments throughout the world. Packer sent one of the world's best polo players, Gonzales Pieres, to try Mambe. Mr. Pieres bought Mambe for Packer. This sale generated favorable publicity for petitioner. Mambe's sale price was the highest that AFC has received for one of its horses. AFC sold a horse for $ 10,000 to Guillermo Gracida's (Gracida) corporation in December 1992. Gracida is a 10-goal polo player. Rizzo prepared a valuation report of AFC's horses as of June 3, 1991, which was shortly after he left AFC. In June 1991, AFC had 45 horses that Rizzo valued at $ 471,000. Petitioner had purchased the horses for a total of $ 70,089. Before the time of the trial, 7 of the 45 horses had been destroyed. 7. Petitioner's Efforts To Reduce Costs
Petitioner took steps to cut AFC's expenses. He persuaded one of his legal clients to sponsor AFC's polo team and a tournament organized by AFC. Petitioner used the advertising *325 income to pay some of AFC's expenses. Petitioner switched from buying hay by the bale to buying it in bulk to save money. He learned to perform some veterinary and dentistry procedures himself, rather than to pay someone to do them. Petitioner traveled throughout the United States and abroad to buy inexpensive horses. AFC paid petitioner's travel expenses. Petitioner stopped insuring the horses because it was too expensive. He also bred horses but quit because it was too costly. Petitioner used to pay commissions to individuals to sell his horses, but then began selling the horses himself. Petitioner helped to train the horses. He used to have five employees on his farm but at the time of trial had two. He put down unsellable horses. Petitioner obtained an agricultural classification for AFC to decrease its real estate taxes. Instead of paying rent for the land AFC leased, petitioner mowed and fertilized the property and painted or built fences. 8. Petitioner's Other Business Endeavors
Petitioner's income from his legal practice was $ 445,209 in 1986, $ 616,590 in 1987, and $ 390,243 in 1988. Before the years in issue, petitioner tried to import leather goods *326 through a corporation known as Polo de Argentina. This business failed after his business partner died. In 1985, petitioner sold 4.5 acres of farm land at a $ 121,548 loss. Before the years in issue, petitioner was involved in a yacht chartering business that incurred losses that were disallowed. OPINION 1. Activity Not Engaged In for Profit
The issue for decision is whether petitioner operated his polo activity through AFC for profit in 1986, 1987, and 1988 for purposes of section 183. A taxpayer may deduct ordinary and necessary business expenses paid or incurred during the taxable year. Sec. 162. The test for deciding whether a taxpayer is carrying on a trade or business under section 162 is whether the taxpayer is engaged in the activity with an actual and honest profit objective. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). *327 Whether petitioner had the requisite profit objective is decided based on all the facts and circumstances. Golanty v. Commissioner, supra; sec. 1.183-2(b), Income Tax Regs. In this context, "profit" means economic profit, independent of tax savings. Herrick v. Commissioner, 85 T.C. 237 (1985); Seaman v. Commissioner, 84 T.C. 564, 588 (1985); Surloff v. Commissioner, 81 T.C. 210, 233 (1983). We give greater weight to the objective facts than to petitioner's statement of intent. Dreicer v. Commissioner, supra; sec. 1.183-2(a), Income Tax Regs. Petitioner bears the burden of proving that he had a profit objective. Rule 142(a); Surloff v. Commissioner, supra.
Section 1.183-2(b), Income Tax Regs., lists some of the factors which may be considered in determining whether an activity is engaged in for profit. They are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying *328 on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is controlling. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Golanty v. Commissioner, supra at 426; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). a. The Manner in Which the Polo Activity Was Conducted
Maintaining complete and accurate records and changing operating methods to increase profit prospects can indicate a profit motive. Elliott v. Commissioner, 90 T.C. 960, 971-972 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990); Ronnen v. Commissioner, 90 T.C. 74, 93 (1988); *329 sec. 1.183-2(b)(1), Income Tax Regs. Petitioner contends that this factor favors him because AFC kept detailed, separate records of the polo activities. Petitioner also argues that he changed AFC's operating methods to reduce costs. For example, petitioner sought the best sources for horses to train, decided not to breed horses when he learned he could not do so economically, and hired good staff for AFC. While petitioner kept good records of his polo activity, his attempts to reduce expenses were minor compared to his large losses. Petitioner did not formulate a formal business plan or make financial projections before he started the polo activity. We are not convinced that petitioner ever had a plausible plan to make AFC profitable. On balance, this factor favors respondent. b. Expertise of Petitioner or His Advisers
Preparing to enter an activity by studying its accepted business, economic, and scientific practices or by relying on expert assistance may indicate a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs.
Petitioner has been involved with polo since he was a child. He subscribes to polo magazines, belongs to a polo association, paid people to teach him *330 how to play polo and to sell polo horses, and relied on experts such as Rizzo. He was not well versed in how to make AFC profitable, which counts against his claim of expertise. However, on balance, this factor favors petitioner. c. The Time and Effort Expended by Petitioner
The fact that a taxpayer devotes much personal time and effort to conduct an activity, or withdraws from another occupation to devote most of his time to an activity, may indicate a profit objective. Sec. 1.183-2(b)(3), Income Tax Regs. Petitioner's time at the farm was limited because he maintained his practice of law during the years in issue. We believe his legal practice detracted from his ability to make a profit. The fact that a taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit objective where the taxpayer employs qualified persons to carry on the activity. Cornfeld v. Commissioner, 797 F.2d 1049, 1052 (D.C. Cir. 1986), revg. and remanding T.C. Memo. 1984-105; Arwood v. Commissioner, T.C. Memo. 1993-352; sec. 1.182-2(b)(3), Income Tax Regs. Because *331 petitioner employed qualified staff to work at AFC, on balance, this factor favors petitioner. d. Expectation of Appreciation in Value
The expectation that assets used in the activity will appreciate in value sufficiently to lead to an overall profit when netted against losses may indicate a profit motive. Sec. 1.183-2(b)(4), Income Tax Regs.
Petitioner contends that he expected AFC's real estate to appreciate in value and that, based on Rizzo's appraisal, AFC's horse inventory had appreciated by $ 400,000 even after taking into account the fact that seven of the horses listed in Rizzo's report were later killed. We disagree. First, petitioner did not offer any projections of his expectation of real estate appreciation when he organized AFC. His expectation of appreciation was at best vague. Second, although we found Rizzo to be generally credible, we believe his appraisal of AFC's horses was overstated. Even the claimed $ 400,000 in appreciation by 1991 is dwarfed by the more than $ 2.3 million in losses AFC sustained from 1982 to 1992. See Tripi v. Commissioner, T.C. Memo. 1983-483. This factor favors respondent. e. Petitioner's *332 Success in Other Activities
The fact that a taxpayer has previously engaged in successful activities may indicate a profit motive. Sec. 1.183-2(b)(5), Income Tax Regs. However, the lack of such experience does not necessarily indicate that the taxpayer lacked a profit objective. Pirnia v. Commissioner, T.C. Memo. 1989-627. Respondent contends that this factor hurts petitioner because: (a) Petitioner unsuccessfully attempted to run a yacht chartering business and an importing business, and (b) he lost money on the sale of farmland in 1985. Petitioner points out that his law firm is successful and the importing business failed because his partner died. Because petitioner has been involved in both successful and unsuccessful business endeavors, this factor is neutral. f. Petitioner's History of Income or Losses
Neither start-up losses nor losses which result from unforeseen circumstances necessarily show the taxpayer lacked a profit objective. Engdahl v. Commissioner, 72 T.C. at 669; sec. 1.183-2(b)(6), Income Tax Regs. However, a record of substantial losses over many years, coupled with the unlikelihood *333 of the activity's becoming profitable, indicates that the taxpayer lacks a profit objective. Golanty v. Commissioner, 72 T.C. at 427. In analyzing the profitability of petitioner's polo activity, both parties consider the losses incurred from 1982 to 1992. AFC has experienced large losses during each of those 11 years, totaling more than $ 2.3 million. Petitioner contends that AFC is still in its formative years, but that the sale of Mambe to a renowned polo player established AFC as a leading producer of quality polo horses and means AFC will become profitable in the near future. Petitioner further asserts that his polo losses were exacerbated because of circumstances beyond his control such as an economic recession and the need to kill horses unfit for polo. We believe that it is a matter of speculation whether AFC will have more sales like Nevada and Mambe. Nevada was sold as a jumper horse, so the high price was not necessarily due to petitioner's efforts. The sale of Mambe was due in part to Mambe's natural talent. In our view, these two sales say little about AFC's potential for future profitability. Start-up losses may be disregarded *334 if they can be recouped by future profits. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). However, we have seen nothing that leads us to expect AFC to recoup the prior losses of more than $ 2.3 million. We are not convinced that AFC was hurt by unforeseen circumstances that were beyond petitioner's control. The need to kill horses should not have been unforeseen, and we are not convinced that an economic downturn caused petitioner's losses. This factor favors respondent. g. The Amount of Occasional Profit, If Any
Small occasional profits with large continuous losses do not indicate a profit objective. Sec 1.183-2(b)(7), Income Tax Regs. Although petitioner testified that he believes that AFC will become profitable in the near future, he concedes that it is not profitable yet. The possibility of substantial future profits in a highly speculative venture may indicate that the activity is operated for profit even though it has generated only losses. Sec. 1.183-2(b)(7), Income Tax Regs. However, we do not believe it is realistic to expect AFC to generate substantial future *335 profits. This factor favors respondent. h. Financial Status of Petitioner
Substantial income from sources other than the activity may indicate a lack of a profit objective when the losses from the activity produce significant tax benefits. Sec. 1.183-2(b)(8), Income Tax Regs. Petitioner had substantial income to absorb the losses. This factor favors respondent. i. Elements of Personal Pleasure or Recreation
Enjoyment of one's work does not show a lack of profit objective if the activity is conducted for profit as shown by other factors. Jackson v. Commissioner, 59 T.C. 312, 317 (1972); sec. 1.183-2(b)(9), Income Tax Regs. Petitioner argues that this factor does not weigh against him because he worked hard at the farm. Respondent contends that petitioner's motive in establishing a polo operation was to gain tax deductions from an activity that he enjoyed. Petitioner has enjoyed polo all his life. We do not believe that he would have continued his polo activities after incurring such large losses if his objective were to make a profit. This factor favors respondent. 2. Relationship Between Petitioner's Polo Activity and His *336 Legal Practice
Petitioner claims that one reason he began his polo activity was to meet clients for his law firm. He asks us to find that the profitability of the polo activity should be calculated based on both polo income and legal fees from polo clients. We will not consider the income from petitioner's law practice in deciding whether AFC was profitable. In deciding whether two or more undertakings may be classified as one activity, we consider all of the facts and circumstances, including the degree of organizational and economic interrelationship, the business purpose served by conducting the undertakings together or separately, and the similarity of the undertakings. Sec. 1.183-1(d)(1), Income Tax Regs. A taxpayer's characterization of an activity is generally accepted unless it is unreasonable. Sec. 1.183-1(d)(1), Income Tax Regs. If two undertakings are treated as two activities, the profit and losses of each are considered separately in deciding if each activity was conducted with a profit objective. Id.
Petitioner relies on Campbell v. Commissioner, 868 F.2d 833 (6th Cir. 1989), affg. in part and revg. in part T.C. Memo. 1986-569, *337 which held that a taxpayer/partner could deduct losses from a partnership formed to lease an airplane to a corporation controlled by the taxpayer and the other partners. He also cites Kuhn v. Commissioner, T.C. Memo. 1992-460, in which a taxpayer was held to have a profit objective with respect to the lease of property he owned to a corporation he controlled. The authority cited by petitioner is not controlling here. The opinions in Campbell and Kuhn did not consider whether the undertakings in question could be treated as one activity for purposes of section 183. Instead, the issue in both of those cases was whether a profit objective could exist for an undertaking that derived its income from a related corporation. Campbell v. Commissioner, supra at 836; Kuhn v. Commissioner, supra.In Campbell and Kuhn, the activity in question was formed solely to benefit the taxpayer's existing business. No such interrelationship exists between petitioner's polo activity and his law practice. AFC was formed and operated as a separate business and did not depend on the law *338 firm to conduct its activities. Also, we believe that if the law firm derived any benefit from AFC, it was at most incidental. We have held that two closely related undertakings are one activity for purposes of section 183. See Keanini v. Commissioner, 94 T.C. 41, 46 (1990) (dog grooming and kennel operations treated as one activity because of close organizational and economic relationship). However, we find more analogous to this case our decision in Schlafer v. Commissioner, T.C. Memo. 1990-66. In Schlafer, we held that an automobile dealer could not count income from his dealership in deciding whether his car racing activity, through which he advertised his dealership, was operated for profit. The two undertakings here are less closely connected than those in Schlafer. AFC and petitioner's law firm are not similar, and there was no organizational interrelationship between them. Schlafer v. Commissioner, supra; sec. 1.183-1(d)(1), Income Tax Regs. We believe there is less of an economic relationship than petitioner claims. We are not convinced that petitioner began *339 the polo activity to generate legal business or that AFC materially benefited petitioner's law practice. At trial, petitioner produced three undated lists of 60 to 127 clients he purportedly met through polo. Petitioner formed AFC in 1982, but he did not keep a list of polo clients until 1987. By then, he may have felt the need for additional ways to argue he had a profit objective. Petitioner's reliance on the list of polo clients appeared to be more of an afterthought than part of a bona fide business plan. The legal fees petitioner argues he received from polo clients would not be sufficient to produce a profit for the polo activity even if we treated his polo activity and his legal practice as one activity. Petitioner contends that he has earned $ 550,000 in net income from his legal practice from polo clients. It is unclear how many polo clients petitioner had, because three different polo client lists were entered into evidence. Even if we use that estimate and assume AFC's real estate could be sold at its acquisition cost and the horses could be sold at petitioner's asserted value of $ 400,000, the polo operation would still have a large net loss even without considering *340 depreciation. 3. Conclusion
We hold that petitioner did not engage in the polo activity for profit. To reflect concessions and the foregoing, Decision will be entered under Rule 155.