T.C. Memo. 2021-140

UNITED STATES TAX COURT

WILLIAM R. HUFF AND CATHY MARKEY HUFF, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22604-17.                     Filed December 21, 2021.

<u>Kevin H. DeMaio</u> and <u>Bryan E. Bloom</u>, for petitioners.

<u>Gennady Zilberman</u> and <u>Byron M. Huang</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

URDA, <u>Judge</u>:  Petitioners, William R. Huff and Cathy Markey Huff, are an extremely wealthy couple who wanted to supplement the income of their adult daughter.  To do so, the Huffs began breeding miniature donkeys through Ecotone Farm, LLC (Ecotone), a wholly owned entity.  During 2013 and 2014 the breeding activity produced losses of $87,236 and $47,039, respectively, which piqued the interest of the Internal Revenue Service (IRS).  The IRS thereafter issued a notice

[*2] of deficiency that disallowed deductions for these losses and determined

deficiencies for their 2013 and 2014 tax years of $37,022 and $19,615,

respectively, as well as accuracy-related penalties under section 6662(a).[1] Finding

that the Huffs engaged in the breeding activity with an actual and honest objective

of making a profit, we conclude that the 2013 and 2014 loss deductions are

allowable and that the Huffs are not liable for penalties.[2]

FINDINGS OF FACT

This case was tried in New York, New York. At trial the parties stipulated

some facts, which are so found. The Huffs lived in Florida when they timely filed

their petition.

A.   The Huffs' Business Background

1.   Investment Management Work

Mr. Huff is a native of Hell's Kitchen in New York, New York, who began

working in the accounting department of Eberstadt Asset Management after

---

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect at all relevant times, and all Rule references are to the Tax
Court Rules of Practice and Procedure. We round all monetary amounts to the
nearest dollar.

[2]The Commissioner has conceded a failure-to-file addition to tax under
sec. 6651(a)(1) of $5,309 for 2013. The Huffs have conceded that the IRS
followed the procedural requirements of sec. 6751(b) with respect to managerial
approval of the accuracy-related penalties.

**[*3]** graduating from high school in 1969.  For five years while at Eberstadt Mr. Huff studied at Baruch College during nights and weekends, ultimately graduating with a degree in accounting, finance, and economics.  Mr. Huff rose from a position paying $90 per week to a position as vice president, managing two of the biggest funds at the firm.

In 1984 Mr. Huff left Eberstadt to start his own investment management firm, W.R. Huff Asset Management Co., LLC (Huff Asset Management).  Since that time Huff Asset Management has invested money on behalf of clients including high net worth individuals, pension and profit-sharing plans, endowments and foundations, and State and local government entities.  As of the end of 2019 Mr. Huff had brought in approximately $35 billion of business to Huff Asset Management since its founding, with approximately $25 billion under management at the company's high-water mark.

Mr. Huff implemented a research-driven investment philosophy at his firm. Huff Asset Management focused on, and developed expertise in, certain investment sectors, including healthcare and life sciences, chemicals, telecommunications, information and data service, defense technology, paper, natural resources, packaging, media, food and retailing, and energy.  When considering whether to invest in a particular business, the firm sought to learn as

[*4] much about the specific business as the people who ran it, talking to suppliers and competitors and reviewing publications and other available information. It would try to understand key business drivers, barriers to entry, pricing power, and costs, among other considerations. After the research was complete, Mr. Huff and his team would decide whether to invest.

Huff Asset Management did not shy away from risk or from underperforming companies. When evaluating investments, Mr. Huff and his team focused on cashflow and the intrinsic value of assets. Consistent with this search for diamonds in the rough Mr. Huff at times invested in businesses that reported net losses at the time of investment but later made it into the black.

Even after Huff Asset Management had a stake in a business, Mr. Huff demanded continual research. He was not hesitant to push for changes that he deemed necessary, particularly with respect to company management. On several occasions, including in the case of the British telecommunications company Virgin Media, Mr. Huff himself went so far as to take the reins of an underperforming business and guide it until he was able to sell for a healthy return.

Huff Asset Management took a long-term perspective with respect to investments. For example it held a stake in Del Monte Foods for approximately four years before that company turned the corner under new leadership (installed at

[*5] the urging of Mr. Huff).  In another example Huff Asset Management increased its investment in the telecommunications company Adelphi Communications despite a bankruptcy filing (and allegations of fraud) because of Mr. Huff's belief in the company's intrinsic value.  Mr. Huff's view was ultimately validated when Time Warner purchased Adelphi for more than the asking price.

Mr. Huff's dedication to his firm meant long hours (often working from early in the morning until late at night, seven days a week) and few outside pursuits, aside from spending time with his wife and his daughter, Jennifer.  For her part Mrs. Huff worked as a lawyer at Huff Asset Management.  The Huffs' diligence and hard work made them very wealthy, with a 2005 Forbes report putting their net worth (at that time) at $750 million.

2.  Doggy Styles, Inc.

In 2003 Mr. Huff took a detour from the world of high finance and founded Doggy Styles, Inc., a dog grooming business in Chatham, New Jersey.  He did so at the behest of his daughter, who wished to open her own canine salon after having worked at a greyhound rescue, in a veterinarian's office, and as a dog groomer.  Mr. Huff's contributions went further than seed money, however.  He helped Jennifer pick a location for the business by studying traffic and parking patterns, negotiated rent (with Mrs. Huff drafting the lease), and paid the costs to

[*6] construct the necessary facilities. Mr. Huff and his employees also advised his daughter on marketing and bookkeeping.

Mr. Huff's financial support continued during Doggy Styles' first five or six years of operation. Gradually Jennifer was able to pay rent and make payroll through her own efforts and those of her employees. At the time of trial Jennifer (as a part-time groomer) was on salary at Doggy Styles, as were three full-time groomers, a full-time receptionist, and a second part-time groomer. Doggy Styles' tax reporting nonetheless showed a net operating loss each year from 2009-18.

B.    The Miniature Donkey Venture

1.    Beginnings

a.    Purchase of the New Jersey Land

In 1987 Mr. and Mrs. Huff purchased 31.35 acres in New Jersey, subject to a conservation easement that permitted most equestrian and agricultural uses. In the late 1990s the Huffs purchased 7-1/2 acres of adjacent property for Jennifer. During the years at issue she lived on that property with her then husband, Danny Mendez, a herpetologist who at one time had worked at the Bronx Zoo and bred a rare species of snake. The Huffs' parcel borders Jockey Hollow, part of Morristown National Historic Park, while Jennifer's abuts land owned by the Audubon Society of New Jersey.

**[*7]** The Huffs' land was "farmland assessed" under New Jersey law from approximately 2004 through 2018, resulting in property tax savings. Mr. and Mrs. Huff lived on their New Jersey farm until approximately 2013.

b. Ecotone

In 2004 the Huffs formed Ecotone, an entity that they owned at all times relevant to this case. The Huffs are the sole members of Ecotone. According to its operating agreement Ecotone was organized for, among other things, "agricultural and equestrian or equine purposes including, without limitation, breeding and raising animals."

2. Investigations

Sometime before 2010 Mr. Huff began to investigate potential uses for his farmland, consulting with Arthur Papetti, a friend and fellow business magnate whose line of business was eggs. Mr. Huff and Mr. Papetti discussed, among other possibilities, using the land for solar panels or to raise chickens, turkeys, or pigs.

These conversations ultimately settled on miniature donkeys. Mr. Papetti, who had extensive experience in the field, enticed Mr. Huff with the promise of considerable returns for successfully breeding donkeys with desirable attributes, such as height (under 30 inches), color (black and white spotted or solid red), and proper conformation (very generally, an equine's shape, structure, and

[*8] proportionality). As part of these conversations Mr. Papetti detailed the importance of maintaining registries of the miniature donkeys as a means to analyze family history and increase the chances of breeding a valuable miniature donkey.

After multiple talks with Mr. Papetti, Mr. Huff turned to his team at Huff Asset Management to research the practicalities involved in a miniature donkey breeding venture. Mr. Huff was particularly concerned with donkey nutrition and husbandry. Before the end of 2009 employees of Huff Asset Management offered recommendations on the best hay to grow in New Jersey for horse feed on the basis of outreach to seed dealers, the National Hay Association, several New Jersey county cooperatives, horse farms and stables, and thoroughbred trainers. The research further touched on soil quality, preparing fields for grazing, and the nutritional needs of different types of horses.

Mr. Huff's team also consulted with various experts. Specifically Huff Asset Management employees had discussions with the Director of Equine Services at Cornell Veterinary Medicine, an Equine and Livestock Resource Educator at Cornell Cooperative Extension Orange County, a Forage Crops Specialist at Purdue University, a Veterinary Technician at Purdue University

[*9] School of Veterinary Medicine, and an Extension Horse Specialist at Penn State University.

Mr. Huff's research acquainted him with potential benefits under New Jersey law of breeding miniature donkeys. If Ecotone were able to generate $2,500 in annual sales and satisfy certain other requirements, it would be considered a commercial farm under the New Jersey Right to Farm Act (Act), which entitled it to certain right-to-farm protections. According to the research assembled by Huff Asset Management the Act protected qualifying farms from "restrictive municipal ordinances and public and private nuisance actions."

3.    Breeding Operation

In mid-2010 the Huffs decided to move forward with breeding miniature donkeys. Mr. Huff, the driving force behind the decision, planned to use Ecotone to assemble a herd of miniature donkeys with attractive genetic attributes (most importantly, a stature of less than 28 inches) that could become self-perpetuating. Mr. Huff thought himself well positioned for this endeavor given his unused farmland, deep research into husbandry, and the expertise of Mr. Papetti, who had agreed to help.

The driving factor in deciding to embark on this enterprise was not a late-discovered passion for adorable little animals. Mr. Huff instead was animated by

[*10] concern over the relatively modest earnings of Jennifer. In addition to working at Doggy Styles Jennifer raised chickens and other animals on her property, supplementing her income by selling eggs, honey, and produce from her garden. Although Mr. Huff assisted his daughter in starting Doggy Styles and had purchased her land for her, she was otherwise independent from the Huffs.

Mr. Huff believed that he could turn the miniature donkey operation over to his daughter once the breeding program had been properly established, allowing her to benefit from his sweat equity. He was particularly enamored with this idea given Jennifer's passion for animals and the proximity between their farms. During the years at issue Jennifer had no familiarity with the miniature donkey breeding operation aside from occasionally caring for the donkeys and a general understanding that the operation would be hers if and when it turned a profit.

a.    Purchases and Sales

Between May and August 2010 Ecotone purchased five miniature donkeys. Over the next eight years, Ecotone bought 20 more miniature donkeys, while selling 20. The 20 donkeys that were sold included some of the donkeys that had been purchased as well as some donkeys born on the farm. By 2019 the breeding stock had been culled to five donkeys, all under 25 inches tall.

[*11] In conducting Ecotone's donkey operation Mr. Huff leaned heavily on Mr. Papetti, who had developed contacts and a reputation in the miniature donkey world. Mr. Papetti was Ecotone's talent scout, visiting miniature donkey farms throughout the Midwest and Northeast, as well as fairs and auctions, in the search for breeding stock.

Mr. Papetti advised Mr. Huff as to which donkeys to buy and at what prices. In determining the value of a miniature donkey, size, coloration, and conformation were particularly important. After hearing Mr. Papetti's rationale for a given price, Mr. Huff would then approve or decline the purchase. At times Mr. Papetti himself would purchase a miniature donkey and then sell it to Ecotone. Mr. Papetti also helped identify buyers for donkeys that Ecotone wished to sell.

Although the Huffs relied upon Mr. Papetti for his insights, they did not always agree with him. For example, as Mr. Papetti's health began to decline in 2015, he proposed to sell 12 miniature donkeys to Ecotone for a total of $10 plus 50% of future sales of the transferred miniature donkeys along with their offspring. Ecotone rejected Mr. Papetti's offer. As Mrs. Huff explained in an email to Mr. Papetti's lawyer, if Mr. Papetti was entitled to 50% of future proceeds, then he "must be liable for 50% of the vet bills, 50% of the food and care of them."

[*12] Ultimately Mr. Papetti agreed to sell to Ecotone 11 donkeys for a total of $10 and to use reasonable efforts to help Ecotone sell those donkeys to third parties.

The prices paid by Ecotone when buying miniature donkeys exceeded by a wide margin the prices Ecotone charged when selling them. All told Ecotone paid $92,985 for 25 donkeys between 2010 and 2018 while selling 20 donkeys during that same time period for $23,500. In four cases Ecotone bought and then sold the same donkey, each time at a steep discount:

| Name | Purchase price (date) | Sale price (date) |
|---|---|---|
| Firebug | $5,000 (5/2010) | $1,350 (11/2010) |
| Flame | 5,000 (5/2010) | 1,425 (2/2011) |
| BASSfarms Peanut | 3,500 (8/2010) | 2,750 (1/2012) |
| Circle S Farm Sioux | 8,500 (3/2013) | 2,500 (6/2014) |

b.    Breeding

Ecotone leaned on Mr. Papetti regarding breeding as well. Although Mr. Huff's investment work gave him some grounding in genetics, he deferred to the advice he was given approximately 90% of the time. Once Mr. Huff made his decision, Wayne Eberle, a general contractor who oversaw the farm, would separate the selected donkeys in paddocks for a few weeks to allow them to breed.

**[*13]** Breeding proved tricky. Although Ecotone's general plan was to breed donkeys as small as possible, some of the foals were delivered stillborn or with genetic deformities. Moreover, some donkeys of smaller stature were simply uninterested in the pleasures of the flesh, complicating the breeding process.

As time went on a difference of opinion arose between Mr. Papetti and Mr. Huff regarding the economics underlying a successful breeding operation. Generally miniature donkeys have a 12-month gestation period, with a female donkey breeding life of roughly 20 years. For his part Mr. Papetti believed in breeding as frequently as possible given these constraints.

Mr. Huff saw downsides to that philosophy. First, Mr. Huff believed that frequent breeding would result in foals that would fail to fetch top dollar but would still need feeding and care, thus cutting into overall profit potential. Second, Mr. Huff's experience with assorted breeding problems called into question Mr. Papetti's aggressive breeding strategy.

Mr. Huff accordingly decided to implement a different strategy at Ecotone, breeding its female donkeys every two years and thus allowing an extra 12 months for recuperation after birth. Mr. Huff believed that this additional recovery time would lead to fewer problems and ultimately greater returns over the breeding life

[*14] of a female miniature donkey, especially given the greater quality control he could exercise over a smaller group of breeding donkeys.

Mr. Huff thought that the market for miniature donkeys generally supported his approach. Although prices for miniature donkeys had declined since he began his operation, he viewed the prices for higher end miniature donkeys as relatively stable. Mr. Huff estimated that, using his approach, each female would produce foals worth $60,000 to $150,000 over the course of her breeding years. Mr. Huff also reasoned that a more boutique operation would enhance Ecotone's brand recognition, which would allow it to command a premium when selling foals.

c. Farm Layout and Care of Herd

The Huffs dedicated 25% of their farmland to the breeding operation, tailoring the land for that purpose. Mr. Huff directed Mr. Eberle as to the placement of donkey fencing, a well, sheds, and pasture areas. He also sought to take advantage of the farm's natural features, positioning the paddocks so that tree cover might serve as a natural windbreak.

In setting up the farm Mr. Huff paid attention to detail. He selected the grade of steel for the donkey fencing, the type of wood for the posts and sheds, and the kind of gravel to be placed beneath rubber mats in the sheds. He also

[*15] determined the mix of grass in the paddocks and rejected certain shingles for the donkey shelters that were made of petroleum rather than wood.

In making these decisions Mr. Huff relied on the research compiled by Huff Asset Management as well as Mr. Papetti's experience. Mr. Huff himself visited a prominent equine breeding operation, which he used to confirm his approach. And he consulted with experts in waste, wells, and farm layout and design.

Most significantly Mr. Huff obtained the views of Robert Mickel, the Hunterdon County Agricultural and Regional Livestock Agent for the Rutgers Cooperative Extension New Jersey Agricultural Experiment Station. Mr. Mickel conducted a site visit to the farm in February 2011 and sent a report summarizing his views regarding how to progress with the breeding program and the farm design and layout. Specifically he recommended a soil analysis of the pasture lands to determine the best grass for planting and offered general observations on grass mixes for superior forage. He also offered to work with Mr. Huff to lay out the pastures for "animal movement, building sites, and watering." Mr. Huff put into practice Mr. Mickel's recommendations.

Deaths in Ecotone's herd prompted a variety of responses in the care of the donkeys. Some of the deaths occurred because of the cold, and so Mr. Huff ordered the electrification of sheds and closing of some openings in the sheds

[*16] during extreme weather. In response to the possibility that the feed might be part of the problem, Mr. Huff experimented with supplemental feeds and rotating the paddocks to cut down on disease. He also changed the daily feeding schedule from one to two feedings in winter to raise the donkeys' metabolisms and keep them warmer. And Ecotone altered its practice of outfitting its donkeys with jackets after learning that such jackets might have negatively affected the donkeys' ability to resist cold.

### d. Recordkeeping and Website

During the years at issue Ecotone maintained books and records detailing donkey purchases and sales, veterinarian visits, and costs such as equipment, supplies, maintenance, and services. It had its own bank account and credit card, and it maintained business filings as a separate entity. Ecotone also maintained a registry of miniature donkeys and registered each donkey with the Miniature Donkey Registry. The registries included information about each donkey's age, sex, color, size, and pedigree. Ecotone additionally placed microchips in the miniature donkeys for purposes of identification and tracking lineage.

Ecotone also maintained a miniature donkey website that Mr. Papetti had transferred to it around 2015. The website's homepage contained four circles with the text "mini donkeys", "stud service", "newborns", and "our farm". These

[*17] circles did not link to other pages or additional information, and the website featured no information regarding any donkeys available for sale. The website, however, did provide general contact information for Ecotone.

After commencing the miniature donkey breeding activity, Ecotone applied for and received commercial farm status for the New Jersey property under the Act. Ecotone retained this status during all years at issue, even when its donkey sales dipped below $2,500 annually.

C.    IRS Examination and Notice of Deficiency

Ecotone reported net losses on its partnership returns for tax years 2010 through 2017 of $21,594, $69,272, $65,304, $87,236, $47,039, $48,926, $24,058, and $35,656, respectively. As is most relevant to this case, on their 2013 and 2014 Federal income tax returns, the Huffs reported adjusted gross income of $21,469,246 and $29,814,468, respectively. In calculating these amounts the Huffs took into account Ecotone's losses for each year.

The IRS thereafter disallowed the partnership loss deductions on the ground that Ecotone was not carrying on a trade or business and mailed to the Huffs a statutory notice of deficiency for their 2013 and 2014 tax years. The IRS determined deficiencies of $37,022 for 2013 and $19,615 for 2014 as well as

[*18] accuracy-related penalties under section 6662(a) of $7,404 for 2013 and $3,923 for 2014.

OPINION

I.  Legal Standards

A.  Burden of Proof

Generally the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and taxpayers bear the burden of showing the determinations are in error.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Since the IRS determined the Huffs' miniature donkey activity was not engaged in for profit, the Huffs have the burden to prove that determination incorrect.[3]

B.  Activities Not Engaged In for Profit

Taxpayers generally can deduct all ordinary and necessary business expenses paid or incurred in carrying on a trade or business.  Sec. 162(a).  In general a taxpayer may not deduct expenses associated with activities not engaged in for profit, such as activities carried on primarily as a sport or hobby or for

---

[3]Sec. 7491(a) shifts the burden of proof to the Commissioner if the taxpayers establish that they complied with the requirements of sec. 7491(a)(2)(A) and (B) to substantiate items, to maintain required records, and to cooperate fully with the Commissioner's reasonable requests.  The Huffs have neither argued that sec. 7491 is applicable nor established that they complied with its requirements.

[*19] recreation. Sec. 183(a); sec. 1.183-2(a), Income Tax Regs. The term "activity not engaged in for profit" is defined by section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

An activity overcomes the limitation set forth in section 183 if it "was entered into with the dominant hope and intent of realizing a profit." Brannen v. Commissioner, 722 F.2d 695, 704 (11th Cir. 1984), aff'g 78 T.C. 471 (1982); see, e.g., Helmick v. Commissioner, T.C. Memo. 2009-220, 2009 WL 3012725, at *7. The expectation of profit need not have been reasonable, but the taxpayers must have entered into the activity, or continued it, with profit as the objective. See Hulter v. Commissioner, 91 T.C. 371, 393 (1988); sec. 1.183-2(a), Income Tax Regs. "The question is not whether we * * * think a particular mode of doing business is wise, but whether the taxpayer honestly believed that the method he employed would turn a profit for him." Cornfeld v. Commissioner, 797 F.2d 1049, 1053 (D.C. Cir. 1986), aff'g T.C. Memo. 1984-105. "The test is the taxpayer's subjective intent, not whether a reasonable businessman would have done the same." Id. (citing Allen v. Commissioner, 72 T.C. 28, 33 (1979)).

This case is not our first foray into determining whether an activity involving equines was entered into for profit. As a general proposition breeding

[*20] and raising equines may be an activity entered into for profit.  See, e.g., Engdahl v. Commissioner, 72 T.C. 659, 665-666 (1979); Den Besten v. Commissioner, T.C. Memo. 2019-154, at *18.  We have often seen cases, however, in which breeding horses does not reflect a legitimate profit-making purpose.  The "stereotypical abusive scenario involving horse breeding is the wealthy businessman who runs a real business during the week * * * and owns a 'gentleman's farm' as a weekend retreat where he keeps horses for the recreation of himself and his family and friends."  Helmick v. Commissioner, 2009 WL 3012725, at *7.  In that typical case the taxpayer "dabbles in breeding horses, with no expectation of ever making a profit, so that he can deduct the expenses of his horses and thereby have Uncle Sam subsidize the weekend farm."  Id.

Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances.  See Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs.  "Evidence from years outside the years in issue can be relevant if it provides context to evaluate the taxpayer's overall requisite profit motive."  Den Besten v. Commissioner, at *18; see also Price v. Commissioner, T.C. Memo. 2014-253, at *52, aff'd, 633 F. App'x 101 (3d Cir. 2016).

**[\*21]** In the case of a partnership, as here, the profit determination is made at the partnership level. See, e.g., Brannen v. Commissioner, 722 F.2d at 703-704. Since the Huffs are the sole members of Ecotone, we look to their actions in running Ecotone to discern the profit motivation. In divining whether a profit motive exists, greater weight is given to objective facts than to a taxpayer's statement of intent. See Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), aff'd, 792 F.2d 1256 (4th Cir. 1986); Rodriguez v. Commissioner, T.C. Memo. 2013-221, at \*28 ("[W]e as the finder of fact need not rely solely on the taxpayer's statement of intent but may resort to objective facts to decide the true intent."); sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., lists nine objective factors to be considered in this regard: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Neither a single factor, nor the existence of

**[*22]** even a majority of the factors is controlling, but rather an evaluation of all the facts and circumstances is necessary. See Golanty v. Commissioner, 72 T.C. 411, 426-427 (1979), aff'd without published opinion, 647 F.2d 170 (9th Cir. 1981); see also Phillips v. Commissioner, T.C. Memo. 1997-128, 1997 WL 105015, at *5.

On the basis of the evidentiary record before us, particularly Mr. Huff's testimony at trial, we conclude that the Huffs entered into the breeding activity with the dominant hope and intent of making a profit. Concerned about his daughter's finances, Mr. Huff sought to combine what he did best (making money) with her chief interest (caring for animals) as a way to supplement her limited earnings. Although Ecotone's business operation had not been profitable up to the time of trial, we do not believe it lacked a profit objective in the years at issue. Rather Ecotone was attempting to build a breeding foundation that would allow for long-term profitability. Ecotone's approach might have been misguided and the operation might never turn a profit. But incorrect business judgment does not belie an honest profit motive. The objective factors that we consider support this conclusion.

[*23] II.    Factor Analysis

A.    Manner of Carrying On the Activity

According to section 1.183-2(b)(1), Income Tax Regs., carrying on an activity in a businesslike manner and maintaining complete and accurate books and records may indicate a profit objective.  "Taxpayers operate in a businesslike manner when, among other things, they have a business plan, advertise goods or services, keep complete records, and respond to losses by changing what they do." Metz v. Commissioner, T.C. Memo. 2015-54, at *26; see also Helmick v. Commissioner, 2009 WL 3012725, at *8; sec. 1.183-2(b)(1), Income Tax Regs. As we will discuss, this factor leans toward the Huffs.

1.    Business Plan

First, Ecotone had a business plan evidenced by the Huffs' actions, viz, to assemble a herd of miniature donkeys with prime attributes, breed the donkeys, and sell the foals.  Mr. Huff testified at trial that once they cracked the genetic code, the Huffs believed that the herd would be self-perpetuating and provide a steady stream of income.  The record before us shows purchases of miniature donkeys that might be bred on the Huffs' farmland, which had been significantly modified for just that purpose.  Although Ecotone did not reduce its business plan to writing, its consultation with experts, implementation of major changes to the

[*24] farm (fencing, pasture, sanitation, and barns, among others), and purchases of breeding stock provide compelling evidence that such a plan existed. See, e.g., Miller v. Commissioner, T.C. Memo. 2008-224, 2008 WL 4449526, at *4; Phillips v. Commissioner, 1997 WL 105015, at *6.

The Commissioner counters that Ecotone had no actual business plan, pointing to decisions such as a quick sale of four miniature donkeys in the early months of the operation. But the "question is not whether we * * * think a particular mode of doing business is wise, but whether the taxpayer honestly believed that the method he employed would turn a profit for him." Cornfeld v. Commissioner, 797 F.2d at 1053. In this case Ecotone sought to turn a profit from breeding miniature donkeys. Selling donkeys at a loss that were intended to be part of the breeding core might raise legitimate questions about the wisdom of the initial purchases, but such sales are not inconsistent with the larger goal of finding breed stock that could produce valuable foals over time. Moreover, decisive action regarding donkeys that were found not suitable for the breeding core would seem essential given the expenses that would otherwise be incurred.

The Commissioner also contrasts Mr. Huff's work in the investment world and in connection with marketing for Doggy Styles with Ecotone's donkey operation, asserting that Mr. Huff's different approach belies the existence of a real

[*25] business plan.  The Huffs, however, conducted research regarding husbandry, implemented changes to their farmland, and obtained the help of Mr. Papetti to guide the Ecotone operation.  The modest scope of the breeding business, of course, meant that their efforts in this regard seemed slight in comparison with billion-dollar deals.  But the size of the potential profit does not bear on whether a business plan existed.

2.    Recordkeeping

Maintenance of complete and accurate books and records is another consideration in determining whether the activity is conducted in a businesslike manner.  Sec. 1.183-2(b)(1), Income Tax Regs.  "At a minimum the taxpayer's books and records must contain the basic information required to make educated business decisions."  Den Besten v. Commissioner, at *22.  We have previously found records kept in an "unprofessional and disorganized manner" to be adequate where the records apprised the taxpayers that their business was unprofitable.  Helmick v. Commissioner, 2009 WL 3012725, at *8.  Taxpayers, however, "need to do more than just keep records to indicate a profit motive; they also need to use those records in an attempt to improve financial results."  Metz v. Commissioner, at *36; see also Golanty v. Commissioner, 72 T.C. at 430 (explaining that

[*26] "trappings of a business" are insufficient and that "the keeping of books and records may represent nothing more than a conscious attention to detail").

In this case Ecotone maintained separate books and records from the Huffs, in which it detailed donkey purchases, veterinarian visits, and costs such as equipment, supplies, maintenance, and services. There is no indication, however, that the Huffs used these records to analyze Ecotone's profitability or expenses, rather than merely memorializing amounts for tax reporting purposes. In fact the record before us shows little attention to the expenses being incurred in this operation, which is in considerable tension with an eye on profit.

Ecotone did maintain a registry relating to the miniature donkeys and also registered each donkey with the national Miniature Donkey Registry. Such records can provide important information to judge an animal's performance (e.g., breeding results and offspring's performance) and evaluate profit potential. See Dodge v. Commissioner, T.C. Memo. 1998-89, 1998 WL 88175, at *4-*5, aff'd without published opinion, 188 F.3d 507 (6th Cir. 1999). Further, we have previously found registering horses to be "a factor that independently weighs in favor of finding that they carried on * * * [the business] in a businesslike manner." Metz v. Commissioner, at *32; see also Helmick v. Commissioner, 2009 WL 3012725, at *9.

**[*27]** In summary Ecotone's recordkeeping is a neutral consideration, providing some support for the Commissioner and some for the Huffs.

       3.      <u>Responses to Problems</u>

"A change of operating methods, adoptions of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive." Sec. 1.183-2(b)(1), Income Tax Regs. Ecotone changed different aspects of its operation in response to exposure and stillborn deaths, including feeding changes, electrifying and closing up parts of the donkey sheds for additional warmth, rotation of pasture lands, and alterations to breeding schedules. Although the Commissioner critiques these decisions, we believe that they were consistent with an intent to improve profitability by ensuring the better survival of donkeys on the farm.

       4.      <u>Conclusion</u>

We are persuaded that the Huffs ran Ecotone in a businesslike manner during the years at issue. The evidence before us shows that the Huffs began Ecotone's business operation with a straightforward plan and a rosy outlook, thinking that a profitable enterprise would ineluctably follow from their investment in the farm and Mr. Papetti's advice. Having made a significant investment, the Huffs were faced with the choice of folding up shop--and thus losing the value of

[*28] their investment--or making changes to try to achieve profitability going forward. The Huffs acted in a businesslike manner in pursuing the latter path with Ecotone.

## B. Expertise of the Huffs and Advisers

Preparation for an activity by extensive study or consultation with experts also may indicate a profit motive when the taxpayer carries on the activity as advised. See sec. 1.183-2(b)(2), Income Tax Regs.; see also Metz v. Commissioner, at *39. "[K]nowledge of the activity itself apart from its economics is not enough to clear the hurdle: A taxpayer must demonstrate expertise and attempts to improve results in a money-losing business." Metz v. Commissioner, at *44. Where a taxpayer deviates from expert advice, "a lack of intent to derive profit may be indicated unless it appears that the taxpayer is attempting to develop new or superior techniques which may result in profits from the activity." Sec. 1.183-2(b)(2), Income Tax Regs.

The Huffs had no prior experience in breeding, boarding, buying, or selling miniature donkeys when they first contemplated embarking on the miniature donkey breeding activity. Mr. Huff nevertheless commissioned deep research into nutrition, soil quality, waste management, water supply, and other aspects of running a miniature donkey breeding business. Most significantly, Mr. Huff

[*29] enlisted the help of Mr. Papetti, who was involved in miniature donkey breeding and advised him about the industry and market.[4]

The Commissioner notes that the Huffs' consultations with experts focused on the operational aspects of the miniature donkey activity and not its economics. This is unsurprising. Mr. Huff's investment background provided the Huffs the necessary perspective to understand the economics underlying the business. Thus, they appreciated that Mr. Papetti's offer to sell 12 donkeys for $10 and future rights was not a good deal, as they would be responsible for all expenses but entitled to only a portion of profits. Their grounding in economics taught them it was better to look the gift donkey in the mouth (to tweak the old saw). What the Huffs lacked was insight into the practical aspects of caring for and breeding donkeys--precisely what they sought to obtain through their research and the advice of Mr. Papetti.

The Commissioner points out, however, that the Huffs ultimately did not pursue the course plotted by Mr. Papetti as to breeding methods. The Huffs' decision to reject that approach was consistent with an attempt to implement a new technique to turn a profit, as contemplated by section 1.183-2(b)(2), Income Tax

---

[4]We do not find credible Mr. Huff's testimony that his then son-in-law, Mr. Mendez, played any substantive role in the breeding operation.

[*30] Regs. Mr. Huff believed that Mr. Papetti's breeding program was too aggressive and might be one explanation for stillborn births. That conclusion may be correct or not, but multiple years of experience with miniature donkeys gave the Huffs sufficient experience to disagree with their expert's approach and try a different path to profit.

We conclude that this factor favors the Huffs.

C.      Time and Effort Expended

Section 1.183-2(b)(3), Income Tax Regs., provides that devoting personal time and effort to carrying on an activity may indicate a profit motive, particularly if the activity does not have substantial personal or recreational aspects. A limited investment of time does not necessarily suggest otherwise, so long as the taxpayer employs competent and qualified people to carry on such activity. See id.; see also Miller v. Commissioner, 2008 WL 4449526, at *7.

Although the Huffs invested a limited amount of time in running Ecotone's donkey operation, we understand that they had only a very limited amount of time to invest given their other business pursuits. We do not believe that they would add to their already full agenda the time and effort involved in breeding miniature donkeys without an important reason, i.e., building a profit-generating business for Jennifer. See Engdahl v. Commissioner, 72 T.C. at 670 ("We think it unlikely that

**[*31]** * * * [the taxpayers] would embark on a hobby costing thousands of dollars and entailing much personal physical labor without a motive.").

Faced with constraints on their time that limited their direct involvement, we examine whether the Huffs employed competent and qualified people to carry on the activity. They did so, leaning on Mr. Papetti (for vision) and Mr. Eberle (for execution). Mr. Papetti had been involved in the miniature donkey world for several years, developing contacts and breeding miniature donkeys, which was precisely the role that the Huffs asked him to fill. For his part Mr. Eberle was the farm caretaker and was competent in implementing the changes to the farm necessary for a breeding operation. Moreover, the Huffs engaged and relied on several other experts to assist with areas such as waste management, wells, and farm layout and design.

This factor accordingly favors the Huffs.

D.    Expectation That Assets May Appreciate in Value

"The term profit encompasses appreciation in the value of assets, such as land, used in the activity." Sec. 1.183-2(b)(4), Income Tax Regs. "[T]he taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized

**[*32]** since income from the activity together with the appreciation of land will exceed expenses of operation." Id.

This factor weighs in favor of the Commissioner. Although the Huffs assert that they expected Ecotone's miniature donkeys to appreciate in value, they introduced no evidence on this point, instead concentrating on the potential earnings to be garnered from the use of the miniature donkeys in the breeding operation. Moreover, Ecotone's pattern of selling miniature donkeys at a loss suggests that appreciation of the breeding stock was unlikely. Cf. Miller v. Commissioner, 2008 WL 4449526, at *5 ("[The taxpayer's] horses were valued at $318,000 with a basis of $34,384. The unrealized gain in the horses indicates that they have appreciated in value."). And the Huffs failed to introduce any evidence regarding appreciation in the value of the land used in the activity, as contemplated in section 1.183-2(b)(4), Income Tax Regs.

E.    Success in Other Activities

"The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable." Sec. 1.182-2(b)(5), Income Tax Regs. "A track record of success in other business ventures may indicate that the taxpayer has the entrepreneurial skills

[*33] and determination to succeed in subsequent endeavors." Annuzzi v. Commissioner, T.C. Memo. 2014-233, at *25-*26; see also Whatley v. Commissioner, T.C. Memo. 2021-11, at *26; Den Besten v. Commissioner, at *29-*30. "A court can infer that a taxpayer's diligence, initiative, foresight, and other qualities will generally lead to success in other business activities if he has demonstrated those qualities by starting his own business and turning that business into a relatively large and profitable enterprise." Den Besten v. Commissioner, at *30. "A taxpayer's success in other, unrelated activities also may indicate a profit objective." Rabinowitz v. Commissioner, T.C. Memo. 2005-188, 2005 WL 1763776, at *13; see also Metz v. Commissioner, at *52; Blackwell v. Commissioner, T.C. Memo. 2011-188, 2011 WL 3444327, at *7; Miller v. Commissioner, 2008 WL 4449526, at *6 (observing a dissimilar business shed light on "business acumen and ability to develop and improve businesses").

This factor weighs in favor of the Huffs. Mr. Huff is a businessman who devoted his life to using his keen business acumen and sharp eye for assets to turn a profit. He has built a very successful career in understanding an operation's intrinsic value and working to maximize that value for his clients and himself. His investment business required him to synthesize a vast array of complicated

[*34] information and then decide how best to pursue profit. His career also led him to develop an innate feel for when an investment has run its course.

We see the same approach here, just on a much smaller scale. He learned about the industry from Mr. Papetti and invested significant amounts of his own and his employees' time in understanding best practices with respect to farm layout and donkey husbandry.

Despite setbacks we believe that the Huffs, acting through Ecotone, continued to see a potential for profit once they had assembled the proper genetic profile for breeding purposes and that they were determined to make the activity profitable. The view that profit would ultimately follow is consistent with several instances in Mr. Huff's business history where initial losses gave way to strong returns. And we credit Mr. Huff's testimony at trial that, if he were not able to turn the business around, he would close rather than give his daughter a business that lost money.

Mr. Huff's experience with Doggy Styles does not undermine our conclusion. Mr. Huff founded the dog salon in concert with his daughter, providing both marketing insights and the funds necessary to prepare the space for the operation. Although Doggy Styles showed consistent losses on its tax returns, we note that the business was covering its actual expenses, including six

[*35] employees on payroll, without any capital infusions from Mr. Huff over the decade before trial.  We conclude that Mr. Huff could reasonably believe that modest upfront expenditures of time and money could ultimately lead to a sustainable small business.  Cf. Blackwell v. Commissioner, 2011 WL 3444327, at *7 ("[The taxpayer's] obvious business acumen and success in business development and management with other companies, along with * * * [his] credible testimony, indicate, to us, an ability, determination, and savvy to make a profit and be successful in * * * [the] horse activity.").

This factor weighs in favor of the Huffs.

F.      History of Income or Losses with Respect to the Activity

"A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit." Sec. 1.183-2(b)(6), Income Tax Regs.  We have recognized that the startup phase of an equine breeding activity is generally 5 to 10 years.  See Engdahl v. Commissioner, 72 T.C. at 669; Rinehart v. Commissioner, T.C. Memo. 2002-9, 2002 WL 23954, at *8.  Moreover, losses sustained because of unforeseen or fortuitous circumstances beyond the taxpayer's control do not preclude a profit motive.  See sec. 1.183-2(b)(6), Income Tax Regs.

[*36] Ecotone plainly had a history of losses, failing to turn a profit in the years at issue, or for that matter in any year from 2010 to 2018. The Huffs nonetheless argue that these losses were consistent with a profit motive, contending that the exposure and stillborn deaths were unforeseen and that the business was in a startup phase.

As an initial matter we are not persuaded that the losses were beyond Ecotone's control within the meaning of section 1.183-2(b)(6), Income Tax Regs. Mr. Eberle testified that the Ecotone herd experienced 10 to 12 deaths from 2010 to 2018. He further testified that an equine veterinarian had explained that these types of deaths were a normal part of a breeding operation. Although the specific deaths might not have been expected, we believe that Ecotone should have expected losses from deaths during this activity and planned accordingly.

We nonetheless agree that the donkey breeding business was within its startup phase during the years at issue and that the exception set forth in section 1.183-2(b)(6), Income Tax Regs., thus applies. Ecotone began the breeding activity in 2010 and was still trying, as Mr. Huff put it, to "crack the code" to assemble the right breeding core during 2013 and 2014. Given that the

**[*37]** years at issue were less than five years into the breeding operation, we conclude that the losses sustained were not indicative of a lack of a profit motive.[5]

### G. Occasional Profits From the Activity

The amount of profits in relation to the amount of losses incurred may provide useful criteria in determining the taxpayer's intent. See id. subpara. (7). As of the date of the trial in this case, Ecotone had not yet earned a profit from its miniature donkey breeding activity, so this factor favors the Commissioner.

### H. Financial Status of the Huffs

"Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." Id. subpara. (8). "Properly construed, the regulation merely makes the commonsense point that the expectation of being able to arrange to have the tax collector share in the cost of a hobby may often induce an investment in such a hobby which would not otherwise occur." Engdahl v. Commissioner, 72 T.C. at 670. Accordingly "the concurrent existence of other income poses the question, rather than answers it." Id.; see also Metz v. Commissioner, at *58. In

---

[5]We further note that Ecotone's losses diminished significantly after 2013. After losses of $87,236 in 2013 and $47,039 in 2014, the years at issue, the losses in the next three years were $48,926, $24,058 and $35,656, respectively.

[*38] answering that question, we have previously considered whether losses from an activity offset substantial other income, see Rabinowitz v. Commissioner, 2005 WL 1763776, at *14, consistent with Congress' concern "about wealthy individuals attempting to generate paper losses for the purpose of sheltering unrelated income", Taras v. Commissioner, T.C. Memo. 1997-553, 1997 WL 777273, at *9, aff'd, 187 F.3d 627 (3d Cir. 1999). We have also considered the activity's recreational aspects. Blackwell v. Commissioner, 2011 WL 3444327, at *8.

During the years at issue, the Huffs plainly had substantial income from other sources. The losses from the miniature donkey operation during the years at issue (again, $87,236 in 2013 and $47,039 in 2014) were dwarfed by the Huffs' adjusted gross income of $21,469,246 and $29,814,468 in 2013 and 2014, respectively. This case consequently does not present the situation where a taxpayer is engaged in generating paper losses for the purpose of sheltering unrelated income or enlisting the Government as an unwilling partner in a hobby.

Of course, the Huffs' wealth leaves open the possibility that they were insensitive to profit or loss when operating Ecotone's donkey breeding activity. We do not believe this to be the case. Although the Huffs were admittedly trying to give Jennifer another income stream, we find credible Mr. Huff's testimony that

[*39] he would not give his daughter a business that was losing money. We further credit his testimony that he planned to shutter the business if it did not turn a profit after the Huffs changed the breeding approach. We do not think the Huffs were attempting to prop up a business that would consistently lose money simply to provide Jennifer a revenue stream. As Mr. Huff put it, if he simply wished to give Jennifer money, there were other, significantly easier ways to do it.

Nor do we view the Huffs' upfront investment--made possible by their extreme wealth--inconsistent with the pursuit of profit. We are convinced that, at the start of the business, the Huffs could reasonably conclude that Mr. Papetti's plan would allow them to quickly assemble a herd and begin recouping their initial and ongoing expenses on the basis of the annual breeding of all of the herd's female donkeys. We are further persuaded that during 2013 and 2014 they continued to believe that they were close to turning a corner, as Mr. Huff had experienced many times before. The Huffs' financial wherewithal allowed them to stay the course, but it did not alter the end goal of profit.

The Commissioner offers several other reasons for the Huffs' pursuit of their operation, tied to their financial status. First, the Commissioner suggests that the Huffs were using the donkey operation to make desired changes to the layout of their farm. We disagree. The modifications made by the Huffs were tailored

[*40] precisely for a miniature donkey breeding operation and do not seem consistent with a general beautification effort. We also note that the Huffs moved from the farm around 2013 or 2014, casting further doubt on this motivation.

The Commissioner also suggests that the Huffs' miniature donkey operation was an attempt to gain certain benefits under State law. First, the Commissioner notes that under New Jersey law a farmland assessment carries with it State property tax benefits. The Huffs' property, however, had been farmland assessed since at least 2004, years before the commencement of the miniature donkey operation. Second, we are likewise unconvinced by the Commissioner's contention that the Huffs engaged in the miniature donkey breeding activity to qualify their property for commercial farm status under the Act. Ecotone is bordered by a national park and Jennifer's land, and the Huffs moved from the farm in 2013 or 2014. We do not believe that the commercial farm benefits (such as protection from nuisance suits) would supply sufficient motivation to the Huffs to spend the time and money to launch a miniature donkey breeding enterprise.[6]

We consequently conclude that this factor favors the Huffs.

---

[6]We note that Ecotone generated no revenue in 2015 or 2016 and only $1,000 in revenue for 2017, while maintaining commercial farm status. This leaves us skeptical that the Huffs were selling miniature donkeys in order to satisfy the monetary requirement for commercial farm status.

**[\*41]** I.     Elements of Personal Pleasure or Recreation

The absence of personal pleasure or recreation relating to the activity in question may indicate the presence of a profit objective.  Sec. 1.183-2(b)(9), Income Tax Regs.; see also Taras v. Commissioner, 1997 WL777273, at \*9.  At trial Mr. Huff credibly testified that he derived "zero personal pleasure" from the miniature donkeys.  As he explained:  "It's a lot of work. \* \* \* I don't cuddle them. I don't pet them. \* \* \* [T]here is no satisfaction of having these.  These are not pets.  This is like livestock."  In fact, Mr. Huff testified that miniature donkeys are "quite ugly" and look like a "gigantic hairball".  Mr. Huff also pointed out that, unlike horses, miniature donkeys could not make up for the hard work with the joys of the saddle.  Jennifer echoed this point, explaining that her "dad's kind of a business guy \* \* \* not the cuddly animal type".  Finding Mr. Huff's cool personal feelings toward the miniature donkeys believable, we conclude that this factor favors the Huffs.  See, e.g., Engdahl v. Commissioner, 72 T.C. at 670-671.

J.     Summary

The nonexclusive objective factors confirm the Court's conclusion that Ecotone had an actual and honest profit objective during the years at issue.  Based primarily on Mr. Huff's testimony, we are convinced that the Huffs believed that the breeding operation, once established, would consistently turn a profit and

[*42] thereby supplement Jennifer's income. The Huffs pursued this objective with an approach similar to those they had brought to bear with respect to other successful investments. Despite their failure to achieve similar success, we are persuaded that in 2013 and 2014 the Huffs, through Ecotone, pursued the breeding operation with the primary purpose and intent of making a profit within the meaning of section 183. Ecotone's partnership loss deductions for these years thus are allowable.[7]

## III.    Accuracy-Related Penalties

Section 6662(a) and (b)(2) imposes an accuracy-related penalty of 20% of the underpayment attributable to a substantial understatement of income tax. The Commissioner bears the burden of production with respect to a taxpayer's liability for penalties. Sec. 7491(c). To satisfy that burden the Commissioner must offer sufficient evidence to indicate that it is appropriate to impose the penalty. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Given the Court's finding that the Huffs' loss deductions are allowable, there was no underpayment of tax and, accordingly, the Huffs are not liable for the accuracy-related penalties under section 6662(a).

---

[7]To be clear, our ruling on this point is focused on 2013 and 2014 and does not address whether the Huffs continued to have an actual and honest profit objective in subsequent years.

[*43] IV.   Conclusion

We hold that the Huffs were engaged in a for-profit activity and their loss deductions are thus allowable.  Accordingly, the Huffs are not liable for the income tax deficiencies or the accuracy-related penalties that the IRS determined.

To reflect the foregoing,

Decision will be entered for

petitioners.